COMMONWEALTH OF
PENNSYLVANIA,
Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Federal Maritime Commission, Delaware
River Port Authority, IML Freight, Inc.,
Philadelphia Marine Trade Association
et al., Japan/Korea-Atlantic & Gulf,
Freight Conference et al., Philadelphia
District Council et al., Pacific Westbound
Conference, City of Philadelphia, Phila-
delphia Port Corporation, State of Texas,
Sea-Land Service, Inc., and Seatrain In-
ternational, Intervenors.

No. 76–1558.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 7, 1977.

Decided June 20, 1977.

Rehearing Denied Aug. 4, 1977.

Gordon P. MacDougall, Sp. Asst. Atty. Gen., of the Commonwealth of Pennsylvania, Washington, D.C., for petitioner.

Henri F. Rush, Atty., I.C.C., Washington, D.C., with whom Mark L. Evans, Gen. Counsel, Charles H. White, Jr., Associate Gen. Counsel, I.C.C., Barry Grossman and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.

Gordon M. Shaw, Atty., Federal Maritime Commission, Washington, D.C., with whom Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, Washington, D.C., was on the brief, for intervenor, Federal Maritime Commission.

R. Frederic Fisher, San Francisco, Cal., for intervenor, Pacific Westbound Conference. Edward D. Ransom, San Francisco, Cal., also entered an appearance for intervenor, Pacific Westbound Conference.

Charles F. Warren, George A. Quadrino, Washington, D.C., and John E. Ormond, Jr., Washington, D.C., were on the brief for intervenors, Japan/Korea-Atlantic and Gulf Freight Conference, et al.

Edward M. Shea and John A. Douglas, Washington, D.C., were on the brief for intervenor, Sea-Land Service, Inc.

Neal M. Mayer and Paul D. Coleman, Washington, D.C., were on the brief for intervenor, Seatrain International. Charles L. Haslup, III, Washington, D.C., entered an appearance for intervenors, Seatrain International.

Martin A. Heckscher, Philadelphia, Pa., entered an appearance for intervenor Delaware River Port Authority.

Ann M. Pougiales, San Francisco, Cal., entered an appearance for intervenor, IML Freight, Inc.

Gordon P. MacDougall, entered appearances for intervenors, Philadelphia Marine Trade Association, et al. and City of Philadelphia.

Abraham E. Freedman, New York City, entered an appearance for intervenor, Philadelphia District Council, et al.

M. Carton Dittmann, Jr., Philadelphia, Pa., entered an appearance for intervenor, Philadelphia Port Corp.

J. David Hughes, Houston, Tex., entered an appearance for intervenor State of Texas.

Before BAZELON, Chief Judge, WILKEY, Circuit Judge, and GESELL,* United States District Judge for the United States District Court for the District of Columbia.

Opinion for the Court filed by WILKEY, Circuit Judge.

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

WILKEY, Circuit Judge:

In this petition for review,[1] petitioner Commonwealth of Pennsylvania[2] requests this Court to set aside the final decision of the Interstate Commerce Commission (hereinafter the ICC or Commission) in Ex Parte No. 261, International Joint Rates and Through Routes.[3] In this decision, which represents the culmination of nearly seven years of Commission activity in this subject area,[4] the ICC prescribed rules requiring the filing of voluntarily established joint through rates[5] for international transportation participated in by both domestic rail, motor, or water carriers regulated by the ICC and ocean carriers regulated by the Federal Maritime Commission (hereinafter FMC).[6] These ICC rules require a separate statement of the inland and ocean portion of the joint through rate, with the ICC limiting its substantive regulation of the single factor joint land/ocean rate to the domestic portion only.[7]

Petitioner challenges the rules issued in Ex Parte No. 261 on two grounds. First, petitioner contends that the ICC lacks jurisdiction to accept the joint through rates for filing. Second, petitioner challenges the Commission's decision to limit its substantive regulation to that portion of the single factor rate accruing to the domestic rail, water, or motor carriers. Finding no merit in either of the arguments put forth by petitioner to support its challenge to the Commission's rules concerning joint international through rates, we affirm the decision of the ICC in Ex Parte No. 261 for the reasons stated herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Definition of Joint Through Rates

In order to understand the action taken by the ICC in Ex Parte No. 261, it is necessary briefly to explain the definition of "joint" and "proportional" through rates and to examine the similarities and differences between these two types of through rates.

A joint through rate is a single charge published by one carrier and concurred in by connecting carriers as the rate that will

---

1. This petition for review is properly filed in this court pursuant to 28 U.S.C. §§ 2341(3)(A), 2342(5), 2343, and 2344.

2. The Commonwealth of Pennsylvania has been joined in its brief by intervenors State of Texas, Delaware River Port Authority, City of Philadelphia, Philadelphia Port Corp., Port of Philadelphia Marine Terminal Assoc., Philadelphia Marine Trade Assoc., and Philadelphia District Counsel, International Longshoremen's Assoc.

Respondents in this case are the ICC and the United States of America. Intervenors on the side of the respondents are the Federal Maritime Commission, Pacific Westbound Conference, The Japan/Korea-Atlantic & Gulf Freight Conference, and IML Freight, Inc.

3. The final decision in Ex Parte No. 261 is reported at 351 ICC 490. This final decision is the fifth in a series of reports on this subject by the Commission. See note 4, infra. See also 49 C.F.R. § 1300 et seq.

4. The first report issued by the ICC in these proceedings was dated 4 September 1970 and is published at 337 ICC 625. The second report, dated 28 June 1972, appears at 341 ICC 246. The third report, dated 12 August 1974, is published at 346 ICC 688. The fourth report, of 27 June 1975, appears at 350 ICC 361. The fifth and final report (note 3, supra) appears at 351 ICC 490.

5. It is to be emphasized that the Commission's rules in Ex Parte No. 261 do not require carriers to establish joint rates. Rather, once the carriers have voluntarily done so, the rules in Ex Parte No. 261 require the carriers then to file the joint rates with the ICC.

With respect to terminology, there are actually three types of "through rates." A through rate is construed to mean the total rate from point of origin to point of destination. A "local through rate" is a rate that extends over the lines of one carrier only. See 49 C.F.R. § 1300.-0(b)(1). For a definition of "joint" and "proportional" through rates, see text at notes 8 to 15, infra.

6. Joint international through rates identical to those filed with the ICC pursuant to Ex Parte No. 261 must also be filed with the FMC under the provisions of the Shipping Act of 1916. See 46 U.S.C. §§ 801 et seq., 817(b); 46 C.F.R. § 536.16. No challenge has been made to the FMC's rule. Since 1972, the identical ocean/inland joint rates have been filed with both the ICC and the FMC.

7. See text at note 29, infra.

apply on a through movement of cargo from a point of origin on the line of one carrier to a point of destination on the line of the other.[8] Each participating carrier retains a "division" of the joint through rate agreed upon between the carriers.[9] Generally, the divisions of joint through rates between inland carriers who are subject only to ICC regulation are a private matter and are not set forth in tariffs on file with the Commission. There is, however, no prohibition against the statement of divisions in tariffs filed with the ICC.

Proportional rates, on the other hand, are rates published by a single carrier or mode of carrier applicable to that part of a movement of a through shipment which the publishing carrier itself handles. A proportional rate applies only to through shipments having a prior or subsequent movement over the line of another carrier. Like a division of a joint through rate, a proportional rate on a through movement is almost always lower than a carrier's purely "local" rate [10] between the same two points on its line. Commonly, each participating carrier in a through route separately publishes its own proportional rate; in combination, these separate proportional rates constitute the through rate. Thus, proportional rates closely resemble the divisions of joint through rates. Correspondingly, a combination of proportional rates is similar in purpose and effect to a joint through rate.

There are, however, important differences between the joint and proportional through rates, and these differences form the basis for petitioner's challenge in this case. In a joint rate with agreed divisions, as opposed to a combination of proportional rates, the total transportation charge is published as a single rate in one tariff, even if the divisions are also stated for other purposes. Joint through rates result in the simplification of, among other things, routing, documentation, and the calculation of charges and billing; this resultant simplification has been put forth as a major advantage of the joint through rate method for filing tariffs.[11] Beyond this level of procedural simplification, however, lies an economic difference between the joint and proportional through rate concepts which is central to petitioner's case.

Generally, a joint through rate is *lower* than the sum of the purely local rates separately published by each participating carrier. Similarly, divisions of joint rates are generally lower than the corresponding local rate. Proportional rates and the combinations thereof can and often do produce the same results. In theory, each proportional rate *can* be approximately the same as the corresponding division of a joint rate; in many contexts, this is indeed the case.[12] In the case of joint rail/ocean through rates (known as "intermodal" or "minibridge" rates) such as are at issue in this case, however, in many instances the joint through rates are *lower* than the combination of proportional rates which preceded them.[13] As a consequence, the joint through rate tariffs have the potential for creating new markets and changing previous patterns of international transporta-

8. See *Denver & R.G.W. R.R. v. Union Pac. R.R.,* 351 U.S. 321, 327, 76 S.Ct. 982, 100 L.Ed. 1220 (1956); *United States v. Great No. Ry.,* 343 U.S. 562, 573, 72 S.Ct. 985, 96 L.Ed. 1142 (1952); *St. Louis S. W. R. R. v. United States,* 245 U.S. 136, 139 n.2, 38 S.Ct. 49, 62 L.Ed. 199 (1917).

9. See, e. g., *Baltimore & O. Ry. v. Alabama Great So. Ry.,* 165 U.S.App.D.C. 226, 506 F.2d 1265, 1266 (1974).

10. See note 5, *supra.*

11. See Brief of Intervenor Seatrain International, S.A., at 4.

12. See, e. g., *Great No. Ry. v. Sullivan,* 294 U.S. 458, 463, 55 S.Ct. 472, 79 L.Ed. 992 (1935).

13. See Brief for Intervenor Pacific Westbound Conference at 5, 7 n.2.

The operation of the joint through rate concept is described by the Commission in a detailed example set forth in 346 ICC at 690–91.

In addition, it may be helpful to note that the "minibridge" rate refers to the situation in which goods are shipped transcontinentally by land to the port of origin on the opposite coast, rather than using ocean conveyance to move the goods from coast to coast.

tion.[14] This consequence forms the basis for petitioner's standing to maintain this action. Petitioner alleges that the new joint through rate tariffs will result in the diversion of business from the Philadelphia port area and therefore cause economic injury in fact to the various port interests.[15] We conclude that this allegation of injury is sufficient to confer standing on the petitioner to seek judicial review of the agency action in Ex Parte No. 261.

## B. *Prior ICC Position on Joint Through Rates*

Prior to 1908, carriers regulated by the ICC and unregulated ocean carriers created through routes and through rates in the form of joint through rates agreed upon by the carriers and in the form of combinations of proportional rates.[16] In its 1908 decision in *Cosmopolitan Shipping Co. v. Hamburg-American Packet Co.,*[17] the Commission adopted a policy that, since ocean carriers were unregulated, inland domestic carriers would not be permitted to file joint through rates with ocean carriers. After this 1908 decision, through rates continued in the form of combinations of proportional rates. Despite the subsequent enactment of the Shipping Act of 1916,[18] which subjected ocean carriers to government regulation, the ICC continued to apply its policy of not permitting the filing of joint through rate tariffs. Instead, the inland and ocean carriers filed their respective proportional rates with the ICC and the FMC. Such

intermodal proportional through rates have long been upheld as lawful.[19]

## C. *Basis for the ICC's Change of Policy*

In 1968 the Department of Transportation sponsored legislation requiring joint international through rates to be accepted for filing by the ICC and the FMC.[20] It was in connection with the Congressional consideration of this legislation that the ICC reviewed the position it had taken in its 1908 decision in *Cosmopolitan Shipping Co.* with respect to joint through rates. On 1 April 1969 the ICC announced to Congress that it now believed that section 1(1)(a) of the Interstate Commerce Act (hereinafter the Act) conferred jurisdiction on the Commission to accept joint through rates for filing.[21] In addition, the Commission announced that new developments—primarily the enactment of the Shipping Act of 1916[22] and the rapid growth of containerization since its inception in 1957[23]—warranted a reconsideration of the previous policy of not accepting the filing of joint through rates.

The proceedings which culminated in the rules being reviewed here were instituted on 31 July 1969.[24] The Commission stated that its purpose in promulgating rules concerning joint through rates was as follows:

[I]t is our goal to facilitate the through transportation of freight by intermodal carriers between the United States and foreign countries. A shipper is benefited

---

14. *See* 346 ICC 690–91.

15. Respondents challenge petitioner's standing to seek judicial review in this case. *See* Joint Brief for Interstate Commerce Commission, United States and Federal Maritime Commission at 29–32. We believe, however, that petitioner has alleged the requisite injury in fact to *justify a grant of standing in this case. See Ass'n of Data Processing Service Orgs. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1968).

16. *See* Brief for Intervenor Pacific Westbound Conference at 4.

17. 13 ICC 266.

18. 46 U.S.C. § 801 *et seq.*

19. *See, e. g., Armour Packing Co. v. United States,* 209 U.S. 56, 67, 79, 28 S.Ct. 428, 52 L.Ed. 681 (1908).

20. S. 3235, Trade Simplification Act of 1968. This legislation was not enacted.

21. *See* Addendum to Petitioners' Brief at 35–37.

22. *See* note 16, *supra.*

23. *See generally* Prospects and Problem of the Container Revolution, 1 L.J. Mar.L. & E.Com. 203; Note, Legal and Regulatory Aspects of the Container Revolution, 57 Geo.L.J. 533 (1969). *See also* note 16, *supra.*

24. *See* 337 ICC at 627.

when he can make a contract with the originating carrier which covers a movement through to the destination at a total charge published in a single tariff. Moreover, the national transportation policy should be fostered and the free flow of commerce spurred by encouraging the establishment of more economical and integrated transportation services between the United States and foreign countries.[25]

During the period from 1969–1976 the ICC published five major reports on the issue of joint international through rates.[26] These reports put forth in some detail the Commission's purposes in and justifications for the rules promulgated in Ex Parte No. 261; taken together, the reports represent an extraordinarily close scrutiny by the Commission of the various dimensions of the joint rate issue. These reports are duly reported in the ICC agency reporting system and fully described in the written submissions presented to this court by the parties to this case; we will, therefore, not describe the content of these reports in detail in this opinion. There is, however, one point concerning the series of reports issued by the ICC which deserves mention at this point.

In its third report on joint through rates, issued 12 August 1974, the ICC stated that it had the authority to suspend and to determine the lawfulness of the entire joint rate—that is, *both* the inland and ocean portions. As the Commission stated:[27]

The Federal Maritime Commission alleges that the Interstate Commerce Commission has no authority to suspend joint international rates in their entirety. In this respect, it insists that the legislative history of the Shipping Act of 1916 clearly shows that ocean rates in foreign commerce are not subject to suspension. We do not believe, however, that this fact interferes with our authority to suspend joint international rates for ocean-rail,

ocean-motor, or ocean-water traffic. This is because the carriers operating in this country are under this Commission's jurisdiction and it is our duty, where the issue is appropriately raised, to determine whether a single-factor rate published jointly with a foreign carrier is unlawful. Such a determination requires the suspension and investigation of the entire joint rate. This Commission's authority to suspend joint international rates, and not merely the division of the domestic carrier, has been proclaimed in several investigation and suspension proceedings.

In its fourth report on this issue, the ICC reiterated its position that it had jurisdiction over the lawfulness of the entire joint rate.[28] In its fifth and final report of 30 January 1976, however, the ICC changed its position with respect to the substantive regulation of the entire joint rate:[29]

In our consideration of the intermodal tariffs filed with this Commission, however, we do not intend to assert jurisdiction over or otherwise to engage in substantive regulation of the ocean portion of the rates pursuant to the Interstate Commerce Act.

Therefore, we wish to emphasize the fact that our jurisdiction will be invoked solely to accomplish substantive regulation of the domestic carrier's portion of the through rate and that any procedural requirements we may impose will be directed to this end.

Thus, from a procedural standpoint, a change in a joint through rate occasioned by a change in only the ocean portion of the rate will not provide grounds for suspension of either the entire rate or the ocean portion alone.

When our suspension procedures are invoked, they will be limited to the divisions accruing to the domestic carrier and the relevant governing provisions.

25. *Id.*

26. *See* notes 3 and 4, *supra.*

27. 346 ICC at 696.

28. 350 ICC at 365.

29. 351 ICC at 491.

From a substantive point of view, challenges to a joint through rate as inconsistent with the provisions of the Interstate Commerce Act will not be entertained unless directed to the domestic carrier's portion of the rate. Any determination of the lawfulness of the portion of a joint through rate accruing to the carriers subject to the jurisdiction of the FMC (ocean carriers) will be left to the FMC.

The Commission's decision to assert regulatory jurisdiction over only the domestic portion of the joint through rate resolved the final remaining major issue in the proceedings. Petitioner filed a petition for reconsideration of the final report issued on 30 January 1976. On 26 April 1976 the petition for reconsideration was denied by the ICC; this petition for review was then timely filed on 25 June 1976.[30] We now turn to an examination of the arguments raised by the petitioner before this Court.

## II. ANALYSIS OF PETITIONER'S CLAIMS

### A. *Jurisdiction to Accept Joint International Through Rates For Filing*

In challenging the jurisdiction of the ICC to accept joint through rates for filing, petitioner focuses only briefly on the precise language of the relevant sections of the Interstate Commerce Act.[31] Rather, petitioner places primary reliance on the inconsistency between the Commission's 1908 decision in *Cosmopolitan Shipping Co.*[32] and the current policy as expressed in Ex Parte No. 261. The proper question, however, is whether the ICC has acted in excess of its statutory jurisdiction in promulgating the joint tariff rules in Ex Parte No. 261. We shall in due course address fully petitioner's claim relating to the inconsistent positions taken by the ICC; we must, however, first

examine the language of the Interstate Commerce Act for guidance as to whether the Commission's action was within its statutory authority.

### 1. *Statutory Provisions*

Section 1(1) of the Interstate Commerce Act defines the parties subject to regulation under Part I of the Act. This section makes the tariff filing requirements and other provisions of Part I applicable to carriers engaged in the

> transportation of passenger or property . . . partly by railroad and partly by water when both are used under . . . [an] arrangement for a continuous carriage or shipment . . . from or to any place in the United States . . . to or from a foreign country, but only insofar as such transportation . . . takes place within the United States.[33]

Section 1(2) of the Act defines the subject matter jurisdiction of the ICC; under this provision, the Act applies to "such transportation" as is described in section 1(1).[34] Thus, the Commission's subject matter jurisdiction extends to foreign commerce "insofar as . . . transportation takes place within the United States."

■ As can be seen, section 1(1) quite significantly refers specifically to "transportation . . . partly by railroad and partly by water . . . under [an] arrangement for a continuous carriage or shipment . . . ." This explicit language of section 1(1) would appear to confer jurisdiction on the ICC over the domestic portion of through routes involving foreign commerce; indeed, these through routes have been defined by the Supreme Court in much the same terminology as is employed in the Act:

**30.** Final agency action for purposes of judicial review occurred on 26 April 1976 with the denial of petitioner's request for reconsideration. This petition was filed on 25 June 1976, within the 60 day limit prescribed in 28 U.S.C. § 2344. *Cf.* Brief of Intervenor Pacific Westbound Conference at 13–16.

**31.** *See* Brief for Petitioner at 14–16.

**32.** *See* note 17, *supra.*

**33.** 49 U.S.C. § 1(1).

**34.** 49 U.S.C. § 1(2). In this section there are listed exceptions to the Commission's jurisdiction which are not relevant to this case.

"an *arrangement*, express or implied, between connecting [carriers] for the *continuous carriage of goods* from the originating point on a line of one carrier to destination on the line of another."[35] Joint through rates are, of course, an integral part of joint through routes; indeed, a joint through rate is itself one of the very "arrangements" between carriers for continuous carriage which creates a through route and to which reference is apparently made in section 1(1). Therefore, the conferral of jurisdiction in section 1(1) over transportation via through route arrangements clearly supports the propriety of the ICC's action in Ex Parte No. 261 with respect to rail/ocean joint tariffs. Indeed, short of having specifically mentioned the concept of intermodalism, we believe this statutory language constitutes a sufficient delegation of authority by Congress to the ICC to promulgate the rules in Ex Parte No. 261.[36]

The statutory history of section 1(1) of the Act lends support to the statutory interpretation outlined above. At the time of the Commission's decision in *Cosmopolitan Shipping Co.*, section 1 of the Act distinguished international transportation on the basis of commerce flowing to foreign countries adjacent to the United States, on the one hand, and to and from non-adjacent foreign countries, on the other; ICC jurisdiction extended only to commerce flowing to adjacent countries.[37] The 1908 Commission view, as reflected in the *Cosmopolitan Shipping Co.* decision, seized on this distinction in partial justification for rejecting joint international rail/ocean tariff filings.[38]

Whatever plausibility the "adjacent" language of section 1(1) may have lent to the Commission's rationale in the *Cosmopolitan Shipping Co.* decision was eliminated by the amendments to section 1(1) contained in the Transportation Act of 1920.[39] The 1920 amendment to section 1 deleted the "adjacent foreign country" language from the statute. The 1920 revision which continues in effect today resulted in the statement of the ICC's jurisdiction as extending to transportation "from or to any place in the United States to or from *a foreign country* . . . ."[40]

Although the Commission's jurisdiction was broadened by the 1920 amendment to include any foreign country, the Act continued to be construed as if the word "adjacent" were still present.[41] The Commission exercised jurisdiction over joint through tariffs with respect to all-rail transportation between the United States and the adjacent foreign countries of Canada and Mexico,[42] while at the same time declining to accept the type of joint through rate tariff authorized in Ex Parte No. 261.

Although the ICC declined jurisdiction over joint through rates after 1920 in spite of the statutory amendment, the Commission now relies on the 1920 change in language as a jurisdictional basis for the action taken in Ex Parte No. 261.[43] The Commission contends that, in light of the 1920 amendment, its practice of not accepting joint rates from 1920–1970 was a "self-

---

**35.** *Thompson v. United States*, 343 U.S. 549, 556, 557, 72 S.Ct. 978, 982, 96 L.Ed. 1134 (1952), *quoting St. Louis Southwestern R. Co. v. United States*, 245 U.S. 136, 139 n.2, 38 S.Ct. 49, 62 L.Ed. 199 (1917) (emphasis added).

**36.** It is not surprising that Congress failed to make specific reference to "intermodalism" or to "minibridge" tariffs. When Congress enacted the Interstate Commerce Act, or even the most recent amendments thereof, there was no intermodalism as practiced today.

The Commission's rulemaking authority, through which the Congressional delegation of authority is largely exercised, is stated at 49 U.S.C. § 904.

**37.** 24 Stat. 379; 34 Stat. 584. *See also* 337 ICC at 628–29.

**38.** 13 ICC at 266.

**39.** *See* 337 ICC at 628.

**40.** *See* note 33, *supra* (emphasis added).

**41.** *See* 337 ICC at 628.

**42.** *Id. See also* notes 47 to 48, *infra.*

**43.** 337 ICC at 628.

imposed restriction on jurisdiction."[44] We agree with this conceptualization of the ICC policy during the period from 1920–1970; our agreement is based on the plain meaning of section 1(1) of the Act which grants authority to regulate through routes between the United States and *any* foreign country. And, since the joint through rate concept is integrally related to the through route concept, the requirement of filing a voluntarily established joint through rate is a proper exercise of the Commission's jurisdictional and rulemaking powers.

■ Consistent with the ICC's jurisdiction set forth in section 1 of the Act, section 6(1) of the Act provides for the filing of tariffs on joint rates between railroads and "any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established."[45] Similarly, section 6(12) is based on the assumption that these joint rates will include joint rail/ocean rates in foreign commerce. Section 6(12) provides:[46]

> If any common carrier subject to this [Act] enters into arrangements with any water carrier operating from a port in the United States *to a foreign country*, through the Panama Canal or otherwise, for the handling of through business *between interior points of the United States and such foreign country*, the Commission may by order require such common carrier to enter into similar arrangements with any or all other lines of steamships operating from said port to the same foreign country.

Thus, while the filing requirements of Ex Parte No. 261 are directed at joint rates voluntarily established between carriers, once such arrangements are created, section 6(12) empowers the ICC to require similar arrangements (*i. e.,* joint through routes and rates) with other ocean carriers. If joint ocean/rail rates cannot be created and filed in the first place, section 6(12), with its "similar arrangement" terminology, would be rendered meaningless. That is, the ICC cannot logically order a railroad to make a "similar arrangement" with other steamship lines for through transportation from interim points in the United States to a foreign country unless through route arrangements were already in effect and sanctioned by the Act. We believe that section 6(12) contemplates the existence of joint rail/ocean through routes and rates and therefore provides further statutory support for the existence of jurisdiction to require the filing of joint through rates.

### 2. *Supreme Court Precedent*

In addition to the considerations as to statutory construction outlined above, the decision of the ICC in Ex Parte No. 261 draws support from the Supreme Court decision in *Canada Packers, Ltd. v. Atchison, T. & S. F. Ry.*[47] In this case the Court upheld the long-standing practice of the ICC in accepting joint rate all-rail tariffs to points in Mexico and Canada.

■ The question in *Canada Packers* was whether the ICC was acting lawfully in going beyond *accepting* the rate tariff for filing and actually engaging in substantive regulation of the level of reasonableness of the *entire* joint rate, including the Canadian portion. For historical reasons, the Court permitted the Commission to continue its long-standing practice of determining the reasonableness of the entire joint through rate. The Court, however, expressed serious doubts whether, as an original matter and absent years of contrary rulings undisturbed by Congress, the ICC had jurisdiction to engage in any substantive regulation of the reasonableness of the Canadian portion of the rate. No such doubts were expressed as to the ICC's power to accept such joint rate tariffs for *filing* (which is the precise issue in question in this petition for review); the power to accept joint rate filings was unquestioned. This decision of the Court, when combined with the 1920

---

**44.** *Id.* at 629.

**45.** 49 U.S.C. § 6(1).

**46.** *Id.* at § 6(12) (emphasis added).

**47.** 385 U.S. 182, 87 S.Ct. 359, 17 L.Ed.2d 281 (1966).

statutory amendment, creates the strong inference that the power to accept joint through rates concerning *any* foreign country, not just Canada or Mexico, is vested in the Commission by the Act.

### 3. *Motor-Ocean and Water-Ocean Carriers*

The decision of the ICC in Ex Parte No. 261 embraces joint through rates entered into between rail-ocean, motor-ocean, and domestic water-ocean carriers.[48] The discussion in Part II.A.I, *supra,* has focused on the rail-ocean paradigm in exploring the question of ICC jurisdiction. In addition, petitioner raises a separate argument that the ICC in any event has no jurisdiction over motor-ocean or domestic water-ocean joint rates.[49] We disagree.

### a. *Joint Rates in Foreign Commerce Between Motor Carriers and Ocean Carriers*

Section 302(a) of Part II of the Act broadly confers jurisdiction on the ICC over "the transportation of passengers or property by motor carriers engaged in interstate *or foreign commerce* . . . ".[50] Section 303(a)(11) in turn defines foreign commerce as

> commerce, whether such commerce moves wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or *water,* (A) between any place in the United States and any place in *a foreign* country.[51]

■ It is necessary to elucidate two points concerning the language of section 303(a)(11) before proceeding to examine additional statutory provisions concerning joint motor/ocean rates. First, it appears clear from the structure of the provisions that the reference to water carriers in section 303(a)(11) is a reference to FMC-regulated carriers operating in foreign com-

merce. Second, since the definition of foreign commerce in § 303(a)(11) tracks the language of § 1(1), the foreign commerce jurisdiction under Part II is as broad as that under Part I. Therefore, Part II foreign commerce jurisdiction also extends to nonadjacent as well as adjacent foreign countries.

Section 316(c) of the Act provides that "[c]ommon carriers of property by motor vehicle may establish reasonable through routes and joint rates, charges, and classifications with other such carriers or with common carriers by railroad and/or express and/or water . . . ".[52] Furthermore, section 317(a) of the Act provides that

> [e]very common carrier by motor vehicle *shall file* with the Commission . . . tariffs showing all the rates . . . in connection [with] foreign commerce . . . between points on its own route and points on the route of any other such carrier, . . . when a through route and joint rate shall have been established.[53]

■ The foregoing sections, taken together, represent an explicit conferral of jurisdiction on the ICC to accept for filing joint through rates established by motor and ocean carriers. Indeed, in light of this language, the Commission's prior policy of not accepting the joint rates appears to be the position most inconsistent with the plain statutory mandate, not the rules embodied in Ex Parte No. 261.

In challenging the ICC's authority to accept joint motor/ocean rates for filing, petitioner points to the 1962 amendment to section 316(c) which conferred jurisdiction on the ICC over joint motor/ocean rates between Alaska and Hawaii on the one hand and the contiguous forty-eight states.[54] Petitioner suggests that, in the absence of a similar amendment covering foreign commerce, no joint rate authority

**48.** *See* sources cited at notes 3 and 4, *supra.*

**49.** *See* Petitioner's Brief at 16–17.

**50.** 49 U.S.C. § 302(a) (emphasis added).

**51.** 49 U.S.C. § 303(a)(11) (emphasis added).

**52.** 49 U.S.C. § 316(c).

**53.** *Id.* at § 317(a) (emphasis added).

**54.** Pub.L. No. 87–595, 1962 U.S.Code Cong. & Adm.News, p. 2160 *et seq.*

over foreign commerce exists.[55]  We disagree with petitioner on this point.

The 1962 amendment to section 316(c) went well beyond purporting to confer the kind of jurisdiction over Alaska/Hawaii joint rates that the ICC has asserted over foreign commerce in the present proceeding.[56]  The purpose of the 1962 amendment to section 316(c) was to make Alaska/Hawaii joint rates "subject to the provisions of this part", thereby bringing such joint rates *in their entirety* under *substantive ICC rate regulation* and thereby ousting the FMC from jurisdiction over the same rates.[57]  Here, by contrast, the ICC has only asserted jurisdiction *to accept* the joint rates for filing, not to regulate the ocean portion of the rate and not to duplicate or replace the FMC's functions.  Thus the 1962 amendment concerning Alaska and Hawaii does not suggest that similar legislation is required in order to support the ICC's action here.

Insofar as the 1962 amendment may have been deemed necessary by Congress merely to permit filing of joint motor/ocean Alaska and Hawaii rates, it must be remembered that as of 1962 the ICC was still applying the policy enunciated in *Cosmopolitan Shipping Co.* against even accepting such rates.  Legislation was one way to change this agency practice.  A well-reasoned and fully explained change of policy by the agency itself—as was done in Ex Parte No. 261—represents another way to accomplish this same result.  A congressional intent to ratify the ICC's restrictive 1908 policy decision can hardly be inferred from the fact that Congress rejected this policy in a specific area of commerce where the filing of joint rates was deemed necessary in 1962.[58]

b.  *Joint Rates in Foreign Commerce with Domestic Water Carriers*

The basic statutory jurisdiction over domestic water carriers involved in through movements in foreign commerce is provided in Part III of the Act.[59]

In defining foreign commerce transportation subject to Part III of the Act, section 902(i) includes transportation

(3) wholly by water, or partly by water and partly by railroad or motor vehicle, from or to a place in the United States to or from a place outside the United States, but only (A) insofar as such transportation by rail or by motor vehicle takes place within the United States, and (B) in the case of a movement to a place outside the United States, only insofar as such transportation by water takes place from any place in the United States to any other place therein *prior to transshipment at a place within the United States for movement to a place outside thereof,* and, in the case of a movement from a place outside the United States, only insofar as such transportation by water takes place from any place in the United States to any other place therein after transshipment at a place within the United States in a movement from a place outside thereof.[60]

Section 905(b) of the Act provides that

It shall be the duty of common carriers by water to establish reasonable through routes with other such carriers and with common carriers by railroad, for the transportation of persons or property, and just and reasonable rates, fares, charges, and classifications applicable thereto, and to provide reasonable facilities for operating such through routes, and to make reasonable rules and regulations with respect to their operation and providing for reasonable compensation to those entitled thereto.  Common carriers by water may establish reasonable through routes and rates, fares, charges, and classifications applicable thereto with

**55.**  *See* Petitioner's Brief at 17.

**56.**  *See* 49 U.S.C. § 316(c).

**57.**  *Id.*

**58.**  *See* 337 ICC at 630.

**59.**  49 U.S.C. § 901 *et seq.*

**60.**  49 U.S.C. § 905(b) (emphasis added).

common carriers by motor vehicle. Common carriers by water subject to this chapter may also establish reasonable through routes and joint rates, charges, and classifications with common carriers by water subject to the Shipping Act, 1916, as amended, or the Intercoastal Shipping Act, 1933, as amended (including persons who hold themselves out to transport goods but who do not own or operate vessels) engaged in the transportation of property in interstate or foreign commerce between Alaska or Hawaii on the one hand, and, on the other, the other States of the Union, and such through routes and joint rates, and all classifications regulations, and practices established in connection therewith shall be subject to the provisions of this chapter. In the case of joint rates, fares, or charges it shall be the duty of the carriers parties thereto to establish just, reasonable, and equitable divisions thereof, which shall not unduly prefer or prejudice any of such carriers.

Section 906(a) in turn requires all joint rates which are established to be filed with the Commission.[61]

■ The only material difference between Part III of the Act and Parts I and II is that section 905(b), *supra,* does not *explicitly* authorize domestic water carriers voluntarily to enter into joint rates with water carriers in foreign commerce.[62] However, we find nothing in Part III purporting to prohibit filing voluntarily adopted joint rates in foreign commerce between FMC and ICC-regulated water carriers.

The question is whether Congress, without explicitly stating that domestic and foreign water carriers can voluntarily enter into and file joint rates, intended, *sub silentio,* to preclude the ICC from issuing rules permitting domestic water carriers voluntarily to do so just as their competitors, the rail and motor carriers, do.

We do not think that Part III can be read so narrowly or that Congress' silence on this point can be elevated into such significance as to put Part III carriers in a different posture than their motor and rail carrier competitors. Congress *did* provide in section 302(i) that ICC-regulated water carriers were subject to ICC jurisdiction in performing the domestic leg of movements in foreign commerce. We believe that this is ample authority, together with the rule-making power of section 904,[63] to permit the limited action that the ICC has taken in Ex Parte No. 261.

### 4. Separate Statement of "Division, Rate, or Charge"

■ The discussion thus far in Part II of this opinion has concerned the jurisdiction of the ICC to accept joint through rate tariffs for filing. In Ex Parte No. 261, however, the Commission decided that it would not simply permit a single factor joint rate to be filed. Rather, the ICC treated the domestic carrier's "division, rate, or charge" as itself an element required to be separately stated in the tariff and subjected to ICC substantive regulation. At this point in the analysis we consider only the decision of the ICC to require the separate statement of the inland charge.[64]

In section 904(a) of the Act, Congress has conferred broad power on the ICC to make "such general or special rules and regulations . . . as may be necessary to carry out [the] provisions [of the Act.]"[65] In requiring a separate statement of the inland portion of a joint rate, we believe that the ICC has properly exercised its rule-making authority to effectuate its foreign commerce jurisdiction outlined at various points above. The need for this type of separate statement is particularly acute in light of the limitation on the ICC's jurisdiction discussed in Part II.B, *infra.* There-

---

61. *Id.* at 906(a).

62. *See* 49 U.S.C. § 905(b).

63. 49 U.S.C. § 904(a).

64. For discussion of the substantive regulation point, see Part II.B, *infra.*

65. *See* note 36, *supra.*

fore, we conclude that the separate statement requirement is a necessary adjunct to the joint rate filing requirements and was not an abuse of discretion on the part of the Commission.

### 5. Inconsistency in Positions Taken by the ICC

Having concluded that the ICC did not act in excess of its statutory authority in promulgating the rules embodied in Ex Parte No. 261, we turn to an examination of petitioner's primary argument that the inconsistency between the decisions in *Cosmopolitan Shipping Co.* (1908) and Ex Parte No. 261 (1976) renders the latter decision an arbitrary and capricious exercise of administrative agency action.

Petitioner's argument with respect to inconsistency in agency policy suffers from a fundamental flaw. Petitioner believes that, since the policy of not accepting joint through rates was in effect for a substantial period of time (1908–1970), the ICC *must* adhere to this policy in the future. Changes in agency policy are not, however, *per se* arbitrary and capricious action; indeed, in many contexts, such changes are to be encouraged as responses to changed circumstances.[66] When a reviewing court examines a change in agency policy, the key factor that guides the scrutiny is whether the policy change has been adequately explained and justified so that the parties upon whom the policy will have an impact understand the newly adopted agency position. As developed in Part II.A, *supra,* we believe that the ICC possesses the jurisdiction to accept joint through rates for filing. Given this conclusion, the change of policy expressed in Ex Parte No. 261 emerges as a well-reasoned and adequate justification for the change.

### B. Substantive Regulation of Domestic Portion of Joint Through Rate

As the second basis for its challenge to the rules enunciated in Ex Parte No. 261, petitioner contends that, if the ICC accepts joint through rate tariffs, the Commission cannot limit its substantive regulation to the inland portion of the joint through rate.[67] According to petitioner, it was an abuse of discretion for the ICC to require a separate statement of the ocean and inland "division, rate or charge" and to limit substantive rate regulation to that portion of the rate covering transportation taking place within the United States.

As noted previously, the Interstate Commerce Act expressly limits the exercise of ICC jurisdiction with the phrase "but only insofar as such transportation takes place within the United States."[68] It is difficult to envision how the action taken by the ICC in Ex Parte No. 261 could have been fashioned in such a manner as to fall more precisely within this express Congressional mandate. There is a vast distinction between accepting a joint through rate for filing and regulating the foreign segment of the transportation involved. The former is possible without involving an invalid extension of *regulatory power* over practices clearly outside the scope of the Act; the latter is not.

Petitioner challenges the ICC decision to limit its substantive regulation as an "unlawful 'settlement' with the F.M.C."[69] Petitioner does not, however, cite any evidence that there was a "settlement" of any kind; this assertion presumably derives from the fact that the ICC changed its position, outlined above,[70] that it had jurisdiction to regulate the entire joint rate (including the ocean portion) in response to complaints from the FMC.[71] The earlier ICC position plainly usurped the FMC's jurisdiction under the Shipping Act and would have created conflicting double regulation

---

**66.** *See, e. g., American Trucking v. A. T. & S. F. R. Co.,* 387 U.S. 397, 415–418, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967).

**67.** Petitioner's Brief at 20–25.

**68.** *See* note 33, *supra.*

**69.** Petitioner's Brief at 20.

**70.** *See* text at notes 27 to 28, *supra.*

**71.** *See* 351 ICC at 491.

of the same rate tariffs by two different agencies applying quite different substantive standards.[72]

It is well established that when two regulatory systems are applicable to a certain subject matter, they are to be reconciled and, to the extent possible, both given effect.[73] It seems to us that the ICC is to be commended for giving heed to the legal objections raised by its sister agency, the FMC; resolution of interagency conflicts by the agencies themselves, as was done in this case, is to be encouraged rather than condemned.

Finally, petitioner emphasizes that the ICC does not, as such, regulate "divisions" as between various carriers subject to ICC regulation except to the extent provided in § 15(6) of the Act.[74] Section 15(6) gives the ICC power to prescribe reasonable divisions when the agreed divisions have been found unlawful. The handling of rate divisions in fully ICC-regulated transportation is irrelevant to what the ICC has done here. The point here is not an attempt to regulate inter-carrier "divisions" as such. There may, for example, be any number of rail carriers sharing in divisions of the inland portion of a joint international rate. The ICC's rules in Ex Parte No. 261 are not directed thereto and do not purport to require a separate statement or regulation of these divisions. All that the ICC has done in requiring a separate statement of the inland "division, rate, or charge" is to focus ICC regulation on that part of the rate and that part of the cargo movement to which its jurisdiction attaches under § 1(1) and similar provisions in Parts II and III of the Act.

Petitioners are unduly concerned with the labels employed by the ICC in Ex Parte No. 261. The use in the alternative of the word "division" to describe the inland portion of the rate does not mean that an inland "division" of a joint international rate means the same thing or produces the same legal consequences as a "division" of a purely inland joint rate. The ICC recognized this when it referred to the portion of the joint through rate subject to ICC regulation as a "division, rate, or charge accruing to the domestic carrier for *its share of the revenue covering a through shipment* . . ."[75]

Petitioners are equally wide of the mark in asserting that shippers are deprived of remedies against carriers' "divisions" of the rate.[76] In fact the regulations of both the FMC and the ICC make clear that the respective ocean and inland portions of the joint rate are treated as proportional rates and therefore subject either to full Shipping Act regulation[77] or full Interstate Commerce Act regulation.[78] Therefore, all rights accruing to the carriers are preserved and are subject to vindication in the *appropriate* federal administrative agency.

## CONCLUSION

In summary, we hold that the ICC has jurisdiction to require the filing of joint international through rates voluntarily established by domestic rail, motor, and water carriers with ocean carriers. In addition, it was not an abuse of discretion to require a separate statement of the inland portion of the rate, particularly since the ICC's jurisdiction extends only to this domestic segment of the transportation. Although the statutorily authorized rules in Ex Parte No. 261 represent a change in previous Commission policy, the change has been explained and justified in a satisfactory fashion. For these reasons, the Commission's action here under review is

*Affirmed.*

**72.** *See* Brief for Intervenor Pacific Westbound Conference at 40; Petitioner's Brief at 22.

**73.** *See, e. g., Radzanover v. Touche Ross & Co.*, 426 U.S. 148, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976).

**74.** Petitioner's Brief at 21.

**75.** 351 ICC at 496 (emphasis added).

**76.** Petitioner's Brief at 23.

**77.** 46 C.F.R. § 536.16.

**78.** 49 C.F.R. § 1300.67(b)(6).