**TRAILER MARINE TRANSPORT CORPORATION, Petitioner,**

v.

**FEDERAL MARITIME COMMISSION and United States of America, Respondents,**

Sea-Land Service, Inc., Seatrain Gitmo, Inc., State of Texas, Intervenors.

No. 78–1307.

United States Court of Appeals, District of Columbia Circuit.

Argued 17 Nov. 1978.

Decided 11 May 1979.

Michael Joseph, Washington, D.C., with whom John Cunningham, Washington, D.C., was on the brief, for petitioner.

Robert J. Wiggers, Atty., Dept. of Justice, Washington, D.C., with whom Robert B. Nicholson, Atty., Dept. of Justice, Mark L. Evans, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, Kathleen M. Dollar, Atty., I.C.C., Washington, D.C., were on the brief, for United States of America and Interstate Commerce Commission.

Gordon M. Shaw, Atty., Federal Maritime Commission, Washington, D.C., with whom Edward G. Gruis, Deputy Counsel, Federal Maritime Commission, Washington, D.C., was on the brief, for respondent Federal Maritime Commission.

Donald J. Brunner, Washington, D.C., with whom John Mason, Washington, D.C., was on the brief, for intervenor Sea-Land Service, Inc.

John L. Hill, Atty. Gen., David M. Kendall, Jr., First Asst. Atty. Gen., J. David Hughes and Marilynn D. Poole, Asst. Atty. Gen., were on the brief, for intervenor State of Texas.

Also Neal M. Mayer and Paul D. Coleman, Washington, D.C., entered appearance for intervenor Seatrain Gitmo, Inc.

Before WRIGHT, Chief Judge, and McGOWAN and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

OUTLINE OF THE OPINION

| | Page |
| --- | --- |
| Introduction | 381 |
| I. FACTUAL AND PROCEDURAL BACKGROUND | 382 |
| II. ANALYSIS | 383 |
| A. Statutory Authority for Jurisdiction of the ICC | 383 |

Introduction                                    Page

    B.  The "Limitation Clause" Objection to ICC Jurisdiction _____ 386

    C.  Statutory Authority Claimed for Jurisdiction of the FMC _____ 393

    D.  The FMC's "Section 21" Claim __ 397

III.  POLICY CONSIDERATIONS _____ 399

Conclusion _____ 400

WILKEY, Circuit Judge:

This case is an inter-agency dispute concerning jurisdiction over the filing and substantive regulation of tariffs on rail-water joint through routes [1] between ports of the Commonwealth of Puerto Rico and inland points of states of the United States, whereby goods are carried by water to or from Puerto Rico and by rail within a state of the United States. Petitioner Trailer Marine Transport Corporation (TMT), a common carrier by water, and the intervenor Interstate Commerce Commission (ICC) argue that the Interstate Commerce Act [2] confers exclusive authority on the ICC to regulate both the rail and water segments of these rail-water joint through routes. The Federal Maritime Commission (FMC) and intervenor Sea-Land Service, Inc. (Sea-Land), a common carrier by water in direct competition with TMT, argue that the Intercoastal Shipping Act of 1920 [3] confers exclusive authority on the FMC to regulate the marine segment of the joint through routes, and that the ICC has authority to regulate only the mainland United States rail segment.

Though the issue of statutory construction is not easy, [4] we believe that the Interstate Commerce (IC) and Intercoastal Shipping Acts, read together, confer plenary and exclusive jurisdiction on the ICC to regulate both the rail and water segments of joint through trade between Puerto Rico and inland points of states of the United States. Thus we vacate in part and remand in part the order of the FMC asserting jurisdiction over the marine segment of the subject rail-water joint through trade and requiring the petitioner to file with the FMC the divisions of joint through rates collected by the petitioner.

Our decision will necessarily turn on a closely measured construction of language of both the Interstate Commerce and Intercoastal Shipping Acts. The merits of arguments put forward by the ICC and the FMC are almost evenly balanced. If these two independent agencies were both members of the Executive branch, the proper sphere of the regulatory authority of each could be authoritatively determined by a ruling from the Attorney General (Office of Legal Counsel) and no recourse to this court would be necessary. Since each is an independent agency, however, each has a right to a judicial delineation of its responsibilities. Thus it becomes our duty to draw the line between the jurisdictions of the two, and in so doing we note the merits of both

---

1. This court has recently defined a "joint through route" as a "through movement of cargo from a point of origin on the line of one carrier to a point of destination on the line of the other." *Commonwealth of Pennsylvania v. ICC*, 182 U.S.App.D.C. 280, 284, 561 F.2d 278, 282 (1977). We have also noted that a joint through rate is the "single charge published by one carrier and concurred in by connecting carriers as the rate that will apply" for carriage along such a joint through route. *See id.*, 192 U.S.App.D.C. at 283–84, 561 F.2d at 281–82.

2. Act of 4 Feb. 1887, ch. 104, 24 Stat. 379, as amended, 49 U.S.C. §§ 1–1240 (1976), and as recodified by Pub.L.No.95–473, 92 Stat. 1337 (17 Oct. 1978), 49 U.S.C.A. §§ 10101–11916 (1979).

3. Pub.L.No.72–415, ch. 199, 47 Stat. 1425–27 (3 March 1933), as amended, 46 U.S.C. §§ 843–48 (1976). The Intercoastal Shipping Act is a part of the Shipping Act, 1916, Pub.L.No.64–260, ch. 451, 39 Stat. 728 (7 Sept. 1916), as amended, 46 U.S.C. §§ 801–42 (1976).

4. As noted by the FMC, the central statutory question at issue is "a matter of first impression whose resolution is clouded by time and legislative ambiguity . . . ." FMC Docket No. 77–75, *In Re: Trailer Marine Transport Corporation—Joint Single Factor Rates, Puerto Rican Trade*, Report and Order of 15 March 1978, *reprinted in* Jt.App. at 88, 99 [FMC proceedings hereinafter cited as FMC Report and Order of 15 March 1978].

competing claims. Though the logic of statutory construction and an examination of the purpose of applicable statutes suggest that jurisdiction properly lies with the ICC, Congress has it in its power to adjust the matter, probably with a single amending sentence, if in this period of reordering of regulation in the field of transportation it should choose for reasons of policy to do so.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The petitioner TMT since early 1975 has operated a single-rate, all-water service for the transport of goods between coastal points of Florida and Puerto Rico pursuant to tariffs on file with the FMC.[5] In August 1977 TMT filed with the ICC a tariff covering a new rail-water ("intermodal") service for the joint through carriage of goods between ports of Puerto Rico and various inland points of the United States.[6] Under the terms of this service, TMT transports goods on the marine segment and rail carriers otherwise unassociated with TMT transport goods on the continental land segment of the journey. Shippers pay a single joint through rate[7] for the transport of goods from point of origin to point of destination, and the tariffs on file with the ICC for these routes show no "divisions" of the joint rates retained by the participating rail and water carriers.[8]

The ICC accepted the tariff proposed by TMT for its through route service in a letter on 21 October 1977 asserting the ICC's "exclusive jurisdiction" over rates included in that tariff.[9] The joint through rail-water service commenced on 8 November 1977.[10] Nevertheless, the FMC issued an order on 18 November 1977 directing TMT to show cause why TMT was not in violation of the Intercoastal Shipping Act by operating the water segment of its joint rail-water trade, pursuant to the tariffs on file with the ICC, without having also filed these tariffs with the FMC.[11] As well as denouncing TMT's refusal to acknowledge the jurisdiction of the FMC over the marine leg of this joint through traffic, the FMC ordered TMT to reveal the divisions of the intermodal tariffs TMT was collecting through its participation in the through route with connecting rail carriers. The FMC argued that information concerning TMT's "share of the revenues collected" on the through route would be necessary to enable the FMC to determine the "reasonableness" of TMT's rates for that carrier's port-to-port service even where no through rate would be charged.[12] The FMC subse-

5. *See* Tariff No. FMC–F–2, filed 11 February 1975, *cited in* Jt.App. at 89 n. 1.

6. *See* TMT Freight Tariff No. 6, ICC No. 2.

7. *See* note 1 *supra.*

8. Generally, as this court noted in an earlier case, carriers participating in the transport of goods along such a joint through route apportion among themselves the fees charged to shippers according to certain agreed " 'division[s]' of the [total] joint through rate . . ." *See Commonwealth of Pennsylvania v. ICC, supra,* 182 U.S.App.D.C. at 284, 561 F.2d at 282. When the participating carriers are subject only to the regulation of the ICC, these "divisions" of joint through rates are "[g]enerally . . . a private matter and are not set forth in tariffs on file with the Commission," though there is no prohibition against doing so. *See id.* TMT argues that disclosure of divisions for the joint through service to and from Puerto Rico would discourage rail carriers from participation in that service, *see* Brief of Petitioner TMT at 29, while FMC and intervenor Sea-Land argue that non-disclosure inhibits free competition among ports and among water carriers for the Puerto Rico trade, *see* Brief for Respondent FMC at 63–65; Brief for Sea-Land at 23–24. Though both sets of claims are plausible, they are not dispositive of the issue of statutory construction before this court.

9. *See* Brief of Petitioner TMT app. 3A.

10. *See* Jt.App. at 89 n. 2.

11. *See* FMC Docket No. 77–55, *Trailer Marine Transport Corporation—Joint Single Factor Rates, Puerto Rican Trade,* Order to Show Cause and File Section 21 Reports, *reprinted in* Jt.App. at 3–7 [FMC proceedings hereinafter cited as FMC Order to Show Cause of 18 November 1977].

12. *See id.* The FMC rested this order to file the divisions of through rates collected by TMT on what the Commission now construes to be a statutory source of authority in the FMC under the Shipping Act, 1916, § 21, 46 U.S.C. § 820

quently issued the Report and Order here under Review,[13] directing TMT to file with the FMC within 30 days tariffs concerning TMT's transport of goods on the marine leg of its joint through routes between Puerto Rico and inland points of the United States. This court on 5 May 1978 granted a motion by TMT for a stay of the FMC Order pending judicial review.[14]

The intervenor Sea-Land, a water carrier seeking to participate in a joint through rail-water service to Puerto Rico similar to that of TMT, has pursued a regulatory route more compatible with that sought by the FMC. Sea-Land elected to file its tariffs for joint routes with *both* the ICC and FMC and to set forth in those tariffs the respective divisions of the joint rates to be retained by participating carriers.[15] Upon instituting an investigation of the joint rates of Sea-Land on file with the ICC, the ICC reaffirmed its view that it has "exclusive jurisdiction" over rates for both the rail and water segments of the subject routes.[16] Still, on 11 September 1978 a majority of

ICC Commissioners voted to defer a final ruling on whether the ICC should seek to enforce that view with regard to Sea-Land, pending resolution by this court of the identical jurisdictional issue concerning the ICC and FMC raised earlier on appeal by TMT.[17] The assignment between the FMC and ICC of jurisdictional rights over tariffs filed by both Sea-Land and TMT, therefore, as well as the jurisdiction of the two agencies over tariffs that may yet be filed by other carriers seeking to establish similar joint through routes in the domestic off-shore trade, will be determined by our disposition of the present case.

## II. ANALYSIS

### A. *Statutory Authority for Jurisdiction of the ICC.*

The source of authority claimed by the ICC to regulate joint through traffic between Puerto Rico and inland points of the United States is IC Act § 1(1), which, as recently recodified,[18] provides that:[19]

(1976), to require the filing of tariff information even where there is no independent statutory basis for FMC substantive regulation of those tariffs. *See* Jt.App. at 4, 89–92, 118. For discussion of this issue, see pp. — – — — of 195 U.S.App.D.C., pp. 397–399 of 602 F.2d & notes 79–89 *infra*.

**13.** *See* FMC Report and Order of 15 March 1978, *supra*.

**14.** An earlier request for such a stay had been denied by the FMC. *See* FMC Docket No. 77–55, Motion for Stay Denied, filed 14 April 1978, *reprinted in* Jt.App. at 121–26.

**15.** *See* Sea-Land Freight Tariff No. 289, ICC No. 122 and Freight Tariff No. 290, ICC No. 123 (FMC Tariff Nos. 45 and 46, respectively), *cited in* Jt.App. at 91 & n. 7.

**16.** *See* Brief of Petitioner TMT app. 8a.

**17.** *See* ICC Decision No. 36810, *Rail-Water Rates, Sea-Land Service, January 1978*, served 2 October 1978. ICC Vice Chairman Christian, however, dissented from the majority's decision to forego resolution of the jurisdictional issue. Commissioner Christian argued in her one-page dissent that although she was "not fully persuaded by the legal arguments on either side," jurisdiction by the ICC over only the continental rail segment of United States-to-Puerto Rico joint through trade would seem to "fit more comfortably into the purpose and design of the Interstate Commerce Act." *See*

*id.* at 3. The Commissioner rested her dissent in large part, however, on this court's decision in *Commonwealth of Pennsylvania v. ICC, supra*, which concerned foreign rather than domestic offshore commerce and which, as we discuss herein, does not control the present case. *See* pp. — – — — of 195 U.S.App.D.C., pp. 395–397 of 602 F.2d & notes 70–78 *infra*.

**18.** Recodification of the IC Act and related laws was effected by Pub.L.No.95–473, 92 Stat. 1337 (enacted 17 Oct. 1978). Section 1 of the Act effects the recodification, § 2 effects certain technical and conforming changes in related laws, § 3(a) provides that "Sections 1 and 2 of this Act restate, without substantive change, laws enacted before May 16, 1978, that were replaced by those sections. Those sections may not be construed as making a substantive change in the laws replaced." *Id.*, 92 Stat. 1466. This prohibition against a construction of substantive change in the recodified Act will require this court to examine closely the language of the IC Act prior to recodification in order to determine the intent of Congress with regard to ICC (and consequently also FMC) jurisdiction under the circumstances of this case. We thus will have occasion frequently to cite the pre-recodification language of the Act, even though most of the statutory sections containing this language have been officially repealed by the recodification. *See* Pub.L. No.95–473, *supra*, § 4(b), 92 Stat. 1466–70.

**19.** 49 U.S.C.A. § 10501 (1979).

(a) Subject to . . . [§§ 10501–62 of the IC Act as amended and recodified, establishing the jurisdiction of the ICC] and other law, the Interstate Commerce Commission has jurisdiction over transportation—

(1) by rail carrier . . . [and] water common carrier . . . that is—

. . . . .

(B) by railroad and water, when the transportation is under common control, management, or arrangement for a continuous carriage or shipment . . [and]

(2) to the extent the transportation is in the United States and is between a place in—

. . . . .

(C) a State and a place in a territory or possession of the United States . .

Section 1(1) is complemented by IC Act § 6(1), which as recodified,[20] provides that "A carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission . . .

shall publish and file with the Commission tariffs containing the rates . . . for transportation or service it may provide under this [Act]." Further, recodified § 15(1)[21] provides that "When the . . . [ICC], after a full hearing, decides that a rate charged or collected by a carrier for transportation subject to the jurisdiction of the Commission under [Part I of the Act] . . . does or will violate this . . . [Act], the Commission may prescribe the rate . . . to be followed." Sections 1(1), 6(1), and 15(1) of the IC Act, therefore, define those carriers and routes that are subject to the tariff-filing requirements and substantive regulatory powers of the ICC.[22]

It is not disputed in the present case that the IC Act's jurisdictional provision covering transportation "by railroad and water, when the transportation is under common control, management, or arrangement for a continuous carriage or shipment"[23] pertains to rail-water joint through traffic of the type at issue here.[24] Nor do we believe it can be seriously disputed that the statutory extension of ICC jurisdiction to rail-water joint through traffic "between a place in—a

**20.** 49 U.S.C.A. § 10762(a)(1) (1979).

**21.** 49 U.S.C.A. § 10704(a)(1) (1979).

**22.** It should be noted, however, that pre-recodification language of sections 6(1) and 15(1) made special reference to ICC jurisdiction over joint through routes and rates, and thus made somewhat more clear than the recodified language that such routes and rates could fall, as a separate and special class, within the jurisdiction of the ICC. Section 6(1), for example, provided in its pre-recodification language that:

Every common carrier subject to the provisions of this chapter shall file with the . . [ICC] . . . schedules showing all the rates, fares, and charges for transportation between different points on its own route *and between points on its own route and points on the route of any other carrier by railroad . . . or by water when a through route and joint rate have been established. . .*

49 U.S.C. § 6(1) (1976) (emphasis added). Likewise, § 15(1) provided that:

Whenever, after full hearing . . . the [ICC] shall be of opinion that any individual *or joint rate, fare, or charge* whatsoever demanded . . . is or will be unjust or unreasonable . . . ., the [ICC] is authoriz-

ed and empowered to determine and prescribe what will be the just and reasonable individual *or joint rate, fare, or charge . .* to be thereafter observed . . . .

49 U.S.C. § 15(1) (1976) (emphasis added). The recodifiers of sections 6(1) and 15(1) evidently believed that it was unnecessary to reiterate in the recodified IC Act's cornerstone jurisdictional section, 49 U.S.C.A. § 10501 (1979), the express mention made in the original language of the ICC's special jurisdiction over joint through routes and rates. The jurisdiction of the ICC over joint through routes and rates under *the IC Act is not*, however, thereby altered or diminished. *See* p. — of 195 U.S. App.D.C., p. 393 of 602 F.2d & notes 59–61 *infra.*

**23.** 49 U.S.C.A. § 10501(a)(1)(B) (1979).

**24.** *Cf. United States v. Munson S. S. Line*, 283 U.S. 43, 47, 51 S.Ct. 360, 362, 75 L.Ed. 830 (1931) (a "mere practical continuity in . . . transportation is not enough" to constitute a "common arrangement" under the terms of former IC Act § 6(1)(a), now 49 U.S.C.A. § 10762(a)(1) (1979)). *See also St. Louis Southwestern Ry. v. United States*, 245 U.S. 136, 139 n. 2, 38 S.Ct. 49, 62 L.Ed. 199 (1917).

State [of the United States] and a place in a territory or possession of the United States",[25] absent any conflicting language elsewhere, confers jurisdiction on the ICC over rail-water joint through trade between any state of the United States and Puerto Rico, since Puerto Rico in the past has commonly been identified as a "territory" and for present legal purposes is commonly identified as a "possession" of the United States.[26] Thus the IC Act explicitly provides for ICC regulation of joint through rates involving rail and water segments, and also for ICC regulation on equal terms of *both the rail and water segments* of such joint through traffic between Puerto Rico

and inland points within states of the United States. It is precisely this type of trade which is at issue in this case. The authority of the ICC to require the filing and to regulate the substantive reasonableness of these tariffs follows logically from the language of recodified IC Act sections 6(1) and 15(1), cited above.[27]

■ Significantly, because of the limited modes and routes of transport to which recodified IC Act § 1(1) confines its application,[28] this Part of the Act confers on the ICC no jurisdiction over transportation on routes "only by water" between the various destinations specified in that subsection.[29]

**25.** 49 U.S.C.A. § 10501(a)(2)(C) (1979).

**26.** The language of IC Act § 1(1), prior to recodification, used only the more antiquated term "territory" to describe the parameters of the ICC's jurisdiction under the provision at issue here. *See* 49 U.S.C. § 1(1) (1976) (ICC jurisdiction over certain common carriers operating "[f]rom one State or Territory of the United States . . . to any other State or Territory of the United States . . . ."). The FMC rightly concluded in its original Report and Order of 15 March 1978, *supra*, that the issue of whether Puerto Rico was to be considered a "state" or a "territory" for the purposes of Part I of the IC Act (now recodified in scattered sections of 49 U.S.C.A. §§ 10101–11916 (1979) was a "red herring," *see* Jt.App. at 109 n. 32.) Thus the FMC assumed "arguendo" that Puerto Rico was to be considered a "territory." *See id.* at 108–09. Remonstrations of intervenor Sea-Land to the contrary, *see* Brief of Sea-Land at 8–14, this assumption of the FMC in its original Report and Order is soundly based. By ratification of the 1898 Treaty of Paris, 30 Stat. 1754, Puerto Rico became a "territory of the United States . . . ," *De Lima v. Bidwell*, 182 U.S. 1, 196, 200, 21 S.Ct. 743, 45 L.Ed. 1041 (1901), thereby joining a growing list of other such lands. *See also Downes v. Bidwell*, 182 U.S. 244, 340, 21 S.Ct. 770, 45 L.Ed. 1088 (1901) (White, J., Shiras, J., and McKenna, J., concurring). Though the proper term of appellation for Puerto Rico has been a subject of some confusion over time, *see, e.g., Benedicto v. West India & Panama Telegraph Co.*, 256 F. 417, 419 (1st Cir. 1919) (describing Puerto Rico as a "quasi territory"), no credible demonstration has been made that Puerto Rico has not long been the type of geographic entity to which Congress intended the term "territory" in IC Act § 1(1) to apply. *See, e.g., American Ry. Co. of Porto Rico v. Didricksen*, 227 U.S. 145, 148, 33 S.Ct. 224, 225, 57 L.Ed. 456 (1913) (the "organization [of Puerto Rico] is in most

essentials that of those political entities known as Territories"); *Kopel v. Bingham*, 211 U.S. 468, 476, 29 S.Ct. 190, 192, 53 L.Ed. 286 (1909) (". . . Porto Rico is a completely organized Territory . . .").

We also must reject the false (though facially appealing) suggestion that Puerto Rico has been specially exempted from the reach of the IC Act under present circumstances by the Act of 2 March 1917, ch. 145, § 38, 39 Stat. 964, 48 U.S.C. § 751 (1976), which provides that "The Interstate Commerce Act . . . shall not apply to Puerto Rico." In *Benedicto v. West India & Panama Telegraph Co., supra*, this provision was definitively construed to mean that the IC Act does not apply to the *"local and intra-island affairs and rates"* of Puerto Rico, *see id.* at 420 (emphasis added). The present case, which concerns joint through routes terminating at ports of Puerto Rico, clearly does not concern Puerto Rico's "local and intra-island affairs and rates." Thus the Act of 2 March 1917 does not apply.

**27.** IC Act §§ 6(1) & 15(1), recodified as 49 U.S.C.A. §§ 10762(a)(1) & 10704(a)(1) (1979), respectively.

**28.** *See* 49 U.S.C.A. § 10501(a)(1) (1979) (pertaining to transportation "by rail carrier, express carrier, sleeping car carrier, water common carrier, and pipeline carrier that is—(A) only by railroad; (B) by railroad and water [on a joint through route] . . . ; or (C) by pipeline or by pipeline and railroad or water when transporting a commodity other than water, gas, or oil . . . .").

**29.** *See id.* § 10501(a)(2) (1979) (pertaining to transportation between states, within the District of Columbia, between a state and a territory or possession, between or among territories or possessions, between two places in the United States through a foreign country, and between the United States and a foreign country).

Thus the Act stops short of conferring on the ICC any jurisdiction over those forms of transportation which are at the heart of the jurisdiction of the FMC: single rate all-water transportation from one port to another port of states of the United States and/or its territories or possessions; like transportation between ports of the United States and foreign countries; and, as will be discussed herein, all-water joint through routes that lie in their entirety between or among such ports.[30] There is thus no language in the key jurisdictional section of the IC Act that warrants intrusion by the ICC into the regulatory domain that Congress expressly conserved for the ICC's sister agency, the FMC, which was established to acquire and exercise a special regulatory expertise over certain water routes.[31]

## B. The "Limitation Clause" Objection to ICC Jurisdiction.

The FMC, however, has raised at least one plausible objection to our construction, above, that the IC Act confers plenary jurisdiction on the ICC over both the rail and water segments of Puerto Rico-to-inland United States joint through trade. This objection rests on an apparent limitation on ICC jurisdiction made prominent in the recently recodified language of the Act:

---

We also must reject the contention of the FMC that the ICC has no jurisdiction over the marine segment of the present joint through trade under former Part I of the IC Act (for which jurisdiction is now provided in 49 U.S. C.A. §§ 10501–05 (1979), entitled "Rail, Rail-Water, Express, and Pipeline Carrier Transportation"), because the ICC's Part I jurisdiction was preempted by enactment of the Transportation Act of 1940, Pub.L.No.76–785, 54 Stat. 898, 929–52 (18 Sept. 1940), which added Part III of the IC Act (for which jurisdiction is now provided in 49 U.S.C.A. §§ 10541–44 (1979), entitled "Water Carrier Transportation"). *See* FMC Report and Order of 15 March 1978, *supra, reprinted in* Jt.App. at 101 (no ICC jurisdiction under Part I because Part III "preempts the vestigial rail/water provisions of section 1(1)(a) [of Part I]" . . .). The short answer to this contention is that Part III of the Act makes no reference to ICC jurisdiction over rail-water joint through routes between states and possessions of the United States or between states and territories of the United States, and thus that Part does not pertain to the present trade. Part I of the Act, on the other hand, pertains directly to the present trade and was not repealed by Part III. Furthermore, by its own terms, Part III expressly provides (in its recodified language) that the jurisdictional provisions of that Part apply to a carrier only "[i]f transportation by a carrier would be subject to the jurisdiction of the [ICC] under *both* . . . [Part III] and . . . [Part I] . . . ." 49 U.S.C.A. § 10541(b) (1979) (emphasis added). Since the present trade is subject to Part I but does not appear to be subject to Part III, § 10541(b) fully disposes of the FMC's contention.

**30.** *See* Shipping Act, 1916, ch. 451, § 1, 39 Stat. 728 (7 Sept. 1916), 46 U.S.C. § 801 (1976) (defining the following routes, which by other sections of the Shipping and Intercoastal Shipping Acts are made subject to various forms of FMC regulation: "foreign commerce," defined as "transportation by water . . . between the United States or any of its Districts, Territories, or possessions and a foreign country . . . ;" and "interstate commerce," defined as "transportation by water . . . on the high seas or the Great Lakes . . . from port to port between one State, Territory, District, or possession of the United States and any other State, Territory, District, or possession of the United States . . . ."). *Cf. Commonwealth of Pennsylvania v. ICC, supra,* 182 U.S.App.D.C. at 293–94, 561 F.2d at 291–92 (sustaining FMC substantive regulation of marine segment of joint through routes *in foreign commerce* ).

**31.** We note, in this context, that the FMC's preoccupation with an imputed distinction between "FMC-regulated" carriers and "ICC-regulated" carriers is unproductive and misleading. *Cf.* Reply Brief of Petitioner TMT at 11. In the case of trade of the type at issue here, there is no such thing as a carrier subject exclusively and invariably to regulation by only one of the two agencies; designation of the appropriate agency to regulate a particular carrier must turn in each instance on the destination and routing of cargo to be carried. The factor relevant to a determination of the appropriate agency to exercise jurisdiction over a particular carrier is thus the *trade activity* rather than the *"identity"* of that carrier. The present case, therefore, is not analogous to a recent case before this court in which we were called upon to distinguish between vessels built with, and vessels built without construction-differential subsidy, and which for reason of such subsidy were bound by statute to participate exclusively in particular forms of trade. *See Alaska Bulk Carriers, Inc. v. Kreps,* 194 U.S.App.D.C. 7, 595 F.2d 814 (1979) (applying Merchant Marine Act of 1936, Pub.L.No.74–835, as amended, 46 U.S.C. § 1101 *et seq.* (1976)).

that ICC jurisdiction extends over specified routes (including routes between a state and a territory or possession of the United States) "to the extent . . . [such] transportation is in the United States . . . ."[32] (hereinafter referred to as the "limitation clause"). Elsewhere in the recodified Act, the "United States" are defined as "the States of the United States and the District of Columbia."[33]

Thus, in a memorandum submitted to this court following the recodification of the IC Act in late 1978,[34] the FMC asserts that "the structure of the recodified statute . . . show[s] that the limitation of ICC jurisdiction to that taking place 'within the United States' [as provided in pre-recodified IC Act § 1(1)] was intended to restrict the ICC's substantive regulatory authority, insofar as the joint rates here . . . are involved, to that part of the transportation performed by the ICC-regulated rail carriers within the states of the United States and the District of Columbia."[35] Though the FMC does not carry the argument to its necessary conclusion, the crux of the contention must be that the limitation clause bars ICC regulation over the marine portion of the present trade because water carriers while en route from any state of the United States to Puerto Rico necessarily pass outside the geographic bounds of the "United States" by crossing the "high seas." By both national and international understanding the high seas belong to *no* state; they are *res communis* and constitute a form of "international space."[36] Thus the

high seas certainly fall outside the above definition of the "United States," and consequently any carrier passing through or into those seas must exit the "United States."

Further, it is an unstated but logical corollary of the FMC argument concerning the limitation clause that the entire range of geographic routes over which the ICC exercises jurisdiction under the recodified IC Act's jurisdictional section[37] is similarly bound by the limitation clause. By this argument, the ICC could not exercise jurisdiction over either single or joint through routes between one "territory or possession of the United States and . . . another such territory or possession," or between "the United States and . . . a foreign country,"[38] to *whatever extent, and at the precise point at which, a carrier on such a route passes outside the United States for the sole reason of crossing or entering the "high seas."* This argument, though facially and technically compelling, must be rejected on several grounds.

First, the FMC argument is seriously undermined by its reliance on the recently recodified language of the IC Act. The applicable statutory language prior to recodification provided, much more ambiguously, that ICC jurisdiction shall extend over carriers engaged in various modes of transportation:[39]

[f]rom one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States, or the District of Colum-

32. 49 U.S.C.A. § 10501(a)(2) (1979).

33. 49 U.S.C.A. § 10102(24) (1979).

34. *See* note 18 *supra.*

35. Supplemental Memorandum of Respondent Federal Maritime Commission, submitted 27 October 1978, at 2 [hereinafter cited as FMC Supplemental Memorandum].

36. Though the extent and nature of national rights in ocean space is presently the subject of international negotiation at the Third United Nations Conference on the Law of the Sea (UNCLOS III), the principle that the "high seas" are not subject to appropriation or exclusive control by any single state, or by any collectivity of states, is of ancient origin, *see, e.*

*g.,* H. Grotius, The Freedom of the Seas (R. Magoffin trans. 1916), and of nearly universal acceptance, *see generally* M. McDougal & W. Burke, The Public Order of the Oceans (1962); J. Kish, The Law of International Spaces (1973). *Cf.* Note, *Thaw in International Law? Rights in Antarctica Under the Law of Common Spaces,* 87 Yale L.J. 804 (1978) (applying principle of "international spaces" to Antarctica).

37. 49 U.S.C.A. § 10501(a)(2) (1979).

38. 49 U.S.C.A. § 10501(a)(2)(D) & (G) (1979).

39. 49 U.S.C. § 1(1) (1976) (emphasis added).

bia, or from one place in a Territory to another place in the same Territory, or from any place in the United States through a foreign country to any other place in the United States, or from or to any place in the United States to or from a foreign country, *but only insofar as such transportation or transmission takes place within the United States.*

It is not immediately clear from the above language which of the various descriptive clauses that precede the italicized "within the United States" limitation were intended by Congress to be modified by the limitation. The transportation at issue in the present case falls within the paragraph's first clause, pertaining to transportation "[f]rom one State or Territory of the United States . . . to any other State or Territory of the United States . . . ." This clause is separated by several intervening clauses from the limitation provision. Though the recodifiers of the section evidently assumed that the limitation clause was intended to apply to *each* of the descriptive clauses in the long and rambling paragraph, for reasons of both common sense [40] and legislative history [41] we are not entirely convinced. Even the FMC is not convinced of this point, for the FMC concedes in its brief the "apparent inapplicabil-

---

**40.** Several of the clauses of former IC Act § 1(1), and likewise of the recodified § 10501(a)(2), would have little meaning if (1) those clauses are subject to the limitation provision, and (2) the limitation provision is afforded the strict geographic meaning urged by the FMC. For example, because of the vast geographic distances that separate the various "possessions" of the United States from each other, most notably in the South Pacific, there are relatively few circumstances under which a carrier could pass between "a territory or possession of the United States and . . . another such territory or possession," 49 U.S.C.A. § 10501(a)(2)(D) (1979), without crossing the "high seas" for at least a substantial portion (if not the entirety) of its voyage and thus passing outside the technical geographic bounds of the "United States." Similarly, there are not today, as also there were not when the limitation clause provision was added in 1920, following the admission of the last contiguous mainland "territory" of the United States to the Union as a state in 1912, many circumstances under which a carrier of any kind could pass between "a State and . . . a territory or possession of the United States," 49 U.S.C.A. § 10501(a)(2)(C) (1979), without also crossing the "high seas." One possible exception may be transport of goods by rail through Canada between the continental United States and Alaska; but such passage is merely hypothetical, for no such rail line existed in 1920, and no such line exists today. Finally, the Supreme Court also has questioned the logical applicability of the limitation provision, at least in its technical geographic sense , to those clauses conferring jurisdiction on the ICC over trade between "a State and . . . another State," and between "the United States and another place in the United States through a foreign country," 49 U.S.C.A. § 10501(a)(2)(A) & (F) (1979). *See United States v. Pennsylvania Ry. Co.,* 323 U.S. 612, 621–22 & n. 12, 65 S.Ct. 471, 89 L.Ed. 499 (1945), cited further at p. —— of 195 U.S.App.D.C., p. 391 of 602 F.2d *infra.*

**41.** The language of IC Act § 1(1), as originally enacted in 1887, contained no "within the United States" limitation. *See* 24 Stat. 379 (1887). Only in a separate clause covering carriage between the United States and non-adjacent foreign countries did the Act, as amended in 1910, refer to ports of transshipment, and thus appeared to limit the jurisdiction of the ICC to the mainland United States segment of such foreign trade prior to transshipment by water. *See* Pub.L.No.61–218, § 7, 36 Stat. 544–45 (1910) (conferring jurisdiction on the ICC over ". . . transportation . . . of property shipped from any place in the United States to a foreign country and carried from such place [in the United States] to a port of transshipment . . . ."). This version of § 1(1) was in effect when the Shipping Act, 1916, was enacted, *see* 46 U.S.C. §§ 801–42 (1976). The language of IC Act § 1(1) was subsequently amended once again by the Transportation Act, 1920, § 400, Pub.L.No.66–152, ch. 91, 41 Stat. 474 (28 Feb. 1920), which amalgamated the clauses in § 1(1) dealing with transportation to adjacent and nonadjacent foreign countries, thereafter referring only to "foreign countr[ies]" generally, and adding as a clause following the foreign commerce provision the "within the United States" limitation. We have found no legislative history indicating that Congress by this amendment expressly intended that the limitation clause added in 1920 be applied to all the prior clauses of IC Act § 1(1) pertaining to non-foreign commerce.

Furthermore, courts since passage of the 1920 amendment have refused to apply a literal construction of the limitation clause even to certain forms of foreign commerce to which the provision, by its grammatical position in former § 1(1), clearly does apply. *See* note 46 *infra.*

ity of the [within the United States] limiting language [in its pre-recodified form]" to state-to-territory trade, such as that between the United States and Puerto Rico.[42] The FMC notes further in its supplemental memorandum that "[t]he structure of . . [the pre-recodified section] alone might have suggested that the limitation of ICC jurisdiction applied only to transportation 'to or from a foreign country.' "[43] The FMC thus asserts that what the original section "might have suggested" concerning the applicability of the limitation clause is no longer suggested by the recodified language, and that therefore the meaning of the limitation language has somehow been altered in the process of recodification. If this is the case, however, the recodifiers exceeded their lawful authority, for Congress explicitly provided that language of the recodified Act "may not be construed as making a substantive change in the laws replaced." [44]

Thus if the recodifiers erred in construing the limitation clause as applicable to each of the routes of trade subject to ICC jurisdiction in IC Act § 1(1), we would have no choice but to rest our construction of the meaning of the limitation clause on the language of § 1(1) rather than on the recodified section. Since we find the limitation

clause inapplicable to the present case on other grounds, we need not reach the issue of the possibility of error in recodification and we raise only a question in this regard.[45] But the contention of the FMC that the language of the recodified IC Act means something different from that of the original Act is untenable in light of the express mission of the recodifiers to alter no substantive provision or meaning of the original statute.

Our second and principal objection to the FMC's proffered application of the limitation clause concerns the meaning of the clause itself. The FMC suggests that ICC jurisdiction over all routes of transportation deemed subject to the limitation must end at the geographic point at which a subject carrier (which over sea routes most usually will be a ship, but may sometimes be a pipeline) passes outside the United States by crossing or entering the "high seas" *without entering a foreign country.* There is no authority that we can find, or that has been cited to us, however, that construes the "in the United States" limitation as setting geographic limitations on the ICC's jurisdiction *except to bar the unbridled over-reaching of such jurisdiction to foreign carriers within foreign countries.*[46]

---

42. *See* Brief for Respondent FMC at 59.

43. *See* FMC Supplemental Memorandum, *supra,* at 2–3.

44. *See* note 18 *supra.*

45. We note, however, that the FMC for reasons of logic cannot possibly prevail over both of our objections to its limitation clause argument. Unless we are to impute an absurd and largely self-destructing construction to the jurisdictional provisions of the IC Act, *see* note 40 *supra* & p. —— of 195 U.S.App.D.C., p. 391 of 602 F.2d *infra,* the limitation clause either (1) cannot have the meaning pressed upon it by the FMC, as we discuss herein, or (2) was not intended to apply to any other than the final clause of the original IC Act § 1(1) to which it was formerly appended, and which pertains to foreign commerce. In either event the FMC's limitation clause objection to ICC jurisdiction over the marine segment of mainland United States-to-Puerto Rico trade must fail.

46. With regard to the meaning of the limitation clause in the context of joint through trade passing overland between the United States and adjacent countries, for example, courts have long refused to accept a technical geographic construction of the clause that would bar ICC jurisdiction over domestic carriers participating in such trade. In the recent, authoritative case of *Canada Packers v. Atchison, Topeka & Santa Fe Ry.,* 385 U.S. 182, 87 S.Ct. 359, 17 L.Ed.2d 281 (1966), for example, the Supreme Court specifically considered the applicability of the limitation clause to the power of the ICC in reparations proceedings to determine the reasonableness of the entirety of a joint through international freight rate between a state of the United States and Canada. The Court found that such through rate jurisdiction of the ICC was of long standing, had been upheld by the Supreme Court "on more than one occasion," had never been contravened by Congress, and had not been shown to produce "any particularly unfortunate consequences." *See id.* at 183–84, 87 S.Ct. 359. The Court also reaffirmed its holding in the earlier case of *News Syndicate Co. v. New York Central Ry.*

*Co.,* 275 U.S. 179, 48 S.Ct. 39, 72 L.Ed. 225 (1927), which it construed to provide that, at least in the context of trade by land between the United States and an adjacent foreign country, "where a carrier performing transportation within the United States enters into a joint through international rate covering transportation in the United States and abroad, the Commission does have jurisdiction to determine the reasonableness of the joint through rate . . ." *Canada Packers v. Atchison, Topeka & Santa Fe Ry. Co., supra,* 385 U.S. at 183–84, 87 S.Ct. at 360. The Court in *Canada Packers* thus refused to embrace a technical construction of the limitation clause even where passage into a foreign country was clearly involved. *Cf. H. K. Porter Co. v. Central Vermont Ry. Co.,* 366 U.S. 272, 275, 81 S.Ct. 1341, 1343, 6 L.Ed.2d 284 (1961) ("It has long been settled that the . . . [ICC's] power to forbid unlawful rate discriminations is in no way diminished because the rates are published as joint through rates . . . [where] the particular transportation by railroads carrying goods in this country happens to be a continuation of carriage from another country. Otherwise the . . . [ICC's] mandate to protect shippers against all undue discriminations would be frustrated with respect to rates that in part include payment for transportation that takes place in a foreign country.").

A trial court in this Circuit, drawn to consider anew the implications of the limitation clause for ICC jurisdiction over joint through trade between the United States and *an adjacent country,* has construed the decisions of the Supreme Court in the above two cases as affirming the jurisdiction of the ICC to "determine the reasonableness of an entire joint through international rate" but as not sustaining, for reason of the limitation clause, direct action for reparations and other remedial action by the ICC "against a *foreign carrier* for actions in a *foreign country* . . . ." *Canadian Pacific Ltd. v. United States,* 379 F.Supp. 128, 133 (D.D.C.1974) (emphasis added). The trial court in *Canadian Pacific* thus construed the jurisdictional powers of the ICC as confined, by reason of the limitation clause, to *domestic carriers* rather than to a strict geographical definition of *domestic territory,* and (implicitly) as extending to foreign carriers not operating wholly within foreign territory. *Id.* at 134. Similarly, in the present case, we deal only with domestic carriers, for it is only carriers that are U.S. built and owned that can carry goods between Puerto Rico and states of the United States, *see* Merchant Marine Act of 1920, § 27, 41 Stat. 999, as amended, 46 U.S.C. § 883 (1976) (the "Jones Act"); *American Maritime Association v. Blumenthal,* 192 U.S.App. D.C. 40, 590 F.2d 1156 (1978). Thus special considerations pertaining to United States regulation of foreign commerce, at issue in our earlier case of *Commonwealth of Pennsylvania v. ICC, supra,* are not present here. *See* note 77 *infra.*

The *Canada Packers, H. K. Porter,* and *Canadian Pacific* cases, cited above, are consistent with a long series of uncontroverted agency decisions, from at least 1910 to the present, which have upheld ICC jurisdiction over various aspects of joint through trade between the United States and adjacent foreign countries despite attempts by parties to bar such jurisdiction through a literal application of the limitation clause. In each of these cases the limitation clause was specifically *not* afforded the highly confining technical construction put forth by the FMC in the present case in the analogous maritime context. We note from these cases a total absence of legal precedent to support the contention of the FMC that the limitation clause has some purpose other than to bar an extension of United States agency jurisdiction into a foreign domain where, for reasons of international comity, it cannot go; and judging from the cases, even the barrier imposed by foreign boundaries on ICC jurisdiction has been found to be somewhat elastic. *See Anglo-Canadian Pulp and Paper Mills, Ltd. v. Aberdeen & Rockfish Ry. Co.,* 351 ICC 325, 361 (1975) (upholding ICC jurisdiction to determine substantive reasonableness of entire joint through rate between United States and Canada, though limitation clause bars direct ICC corrective action against *carriers operating exclusively in Canada* ); *Prince Albert Pulp Co. v. Canadian Nat'l Railways,* 349 ICC 482, 493–94 (1974) (limitation clause no bar to ICC order against "unlawful preference and prejudice" by foreign carrier on joint through transport movements within United States); *Oil Country Iron or Steel Pipe, Midwest to Oklahoma and Texas,* 332 ICC 540, 542 (1968) (noting ICC's "complete regulatory power over domestic carriers participating in . . . joint rates" by rail with adjacent foreign countries, despite limitation clause); *Sulphur, Canadian Origins to East St. Louis, Ill.,* 326 ICC 288, 292–93 (1966) (limitation clause bars ICC only from prescribing "international rates for application partly within Canada" on overland travel from United States, but does not bar ICC from ordering carrier operating partly within United States to cease and desist from participating in unlawful joint through rate); *Cyanamid and Crude Cyanide from Niagara Falls, Ontario, to Eastern Trunk Line, New England, and C.F.A. Points and Virginia Cities,* 155 ICC 488, 490–92 (1929) (limitation clause only sets necessary restriction on ICC jurisdiction over transportation "wholly within a foreign country," though fact that portion of route lies in foreign country is no barrier to ICC jurisdiction over United States carrier); *International Nickel Co. v. Director General, As Agent, and Grand Trunk Railway Co. of Canada,* 66 ICC 627, 629 (1922) (limitation clause merely expresses fact that "territorial jurisdiction [of the ICC] as to foreign commerce is . . . coextensive with that of the federal government . . . [and extends up to but not beyond the] boundary

This more circumspect construction of the limitation clause has received strong support from the principal authority on point. In *United States v. Pennsylvania Ry. Co.*[47] the Supreme Court held that, despite the limitation provision in IC Act § 1(1), the ICC has certain substantive regulatory power[48] over rail-water through routes established between an inland point and a port of the United States where a water portion of the route passes through a foreign port and through international waters. The Court construed a series of earlier cases that turned on the same limitation language as meaning "simply . . . that . . . Congress . . . had, by the limiting provisions . . . expressed its purpose not to empower the . . . [ICC] to regulate rail transportation *in foreign countries.*"[49] The Court noted that the limitation clause could not possibly be applicable to the ICC's power to regulate routes " 'from a place in the United States to another place in the United States' " because "a substantial part of intercoastal and lake transportation among the states . . . *traverses waters outside of the territorial limits of the United States.*"[50] The Court further noted that the power conferred on the ICC to regulate trade " 'from any place in the United States through a foreign country to any other place in the United States' " would "have little meaning, if the limiting clause were given the interpretation [that such transportation could not pass outside U.S. territorial waters while remaining subject to ICC jurisdiction]."[51] The Court held, finally, that under the circumstances of that case the limitation clause did not impair or limit the authority of the ICC generally to establish and regulate joint through rates, and also, most crucially, that "There is therefore *nothing* in the [IC] Act to deny the . . . [ICC] the same power over interstate water-rail transportation *which passes through foreign waters as . . . it enjoys where the transit is wholly within the territorial limits of the United States.*"[52]

The attempt of the FMC to distinguish *Pennsylvania Ry.* from the present case is of no avail. Contrary to the contentions of the FMC, the Court in *Pennsylvania Ry.* noted explicitly that the limitation language there at issue "basically rests on paragraphs (1) and (2) of § 1 of the Interstate Commerce Act,"[53] which in recodified form (except to any extent altered in meaning through recodification) is the same lan-

line [with a foreign country] . . . ."); *Black Horse Tobacco Co. v. Illinois Central Ry. Co.,* 17 ICC 588, 590–91 (1910) (ICC may not prescribe, but may determine reasonableness of joint through rate between United States and Mexico, as adjacent country).

As will be discussed herein, *see* pp. ——.—— of 195 U.S.App.D.C., pp. 396–397 of 602 F.2d & notes 70–78 *infra,* none of these cases is inconsistent with the recent decision of this court in *Commonwealth of Pennsylvania v. ICC, supra,* which affirmed the authority of the ICC to require the filing of (but not substantively to regulate) tariffs for the marine leg of rail-water joint through trade *in purely foreign commerce* between the United States and foreign countries, where such trade is not carried exclusively overland to an adjacent foreign country, and where for reasons not relying principally on application of the limitation clause we sustained a bifurcation of substantive jurisdiction over such trade between the FMC and ICC.

**47.** 323 U.S. 612, 65 S.Ct. 471, 89 L.Ed. 499 (1945).

**48.** At issue in *Pennsylvania Ry.* was the authority of the ICC to require a railroad to interchange its cars with a water carrier along the subject through route. *See also* p. —— of 195 U.S.App.D.C., p. 392 of 602 F.2d *infra.*

**49.** *Id.* at 621, 65 S.Ct. at 476 (emphasis added).

**50.** *Id.* (emphasis added).

**51.** *Id.* at 622 n. 12, 65 S.Ct. at 476 (emphasis added). *Cf.* note 40 *supra* (noting other absurd results to follow from a general and literal application of limitation clause to jurisdictional provisions of IC Act).

**52.** *United States v. Pennsylvania Ry. Co., supra,* 323 U.S. at 622, 65 S.Ct. at 476 (emphasis added). *See also* note 55 *infra* (construing this holding as applicable to limitation clause language in both Parts I and III of the IC Act).

**53.** *Id.* at 620, 65 S.Ct. at 475.

**392**

guage at issue here.[54] The contention that the logic of the Supreme Court's decision in *Pennsylvania Ry.* must be confined to the issue of foreign *railroad* transportation also misses the mark. Factually, *Pennsylvania Ry.* is quite closely on point for present purposes since it dealt with joint through rail-water routes passing through foreign waters, and with regulations that the ICC sought to impose on carriers engaged in the transport of goods on the extra-territorial water segments of such voyages. Furthermore, the railroad cars carried by train and boat in *Pennsylvania Ry.* had the same commercial purpose as the containerized cargoes shifted between train and boat at issue in the present case. The principal factual difference between *Pennsylvania Ry.* and the present case is that the former dealt with interstate shipments via a foreign port, while the present case deals with shipments between inland points of the United States and a port of a United States "possession." For the purpose of the limitation clause under Part I of the Act, however, this distinction is irrelevant, for the jurisdiction of the ICC over both routes of transportation is conferred in the same statutory section,[55] and ICC jurisdiction over *both* routes is subject, if jurisdiction over either route is subject, to the same limitation.[56] Thus if the ICC's interstate jurisdiction under Part I of the Act is not subject to the "in the United States" limitation, in the sense that such jurisdiction is barred "to the extent" that a subject carrier crosses international space without entering a foreign country, then the ICC's state-to-"possession" jurisdiction under that Part is also not subject to the limitation, in that technical, geographic sense.

We believe that logically the only purpose intended to be served by the limitation clause was to avoid jurisdictional conflicts between the United States and foreign countries, rather than to separate the jurisdictional functions of the ICC and the FMC.[57] It follows, therefore, that at least

54. *See* 49 U.S.C.A. § 10501(a) (1979).

55. *See id.* It is true that the Supreme Court in *Pennsylvania Ry.* premised its holding in part on language then codified as Part III of the IC Act (pertaining to "Water Carriers", 49 U.S.C. §§ 901–23 (1976)), and pointed especially to certain definitional language in IC Act § 302(i)(2), 49 U.S.C. § 902(i)(2) (1976), recodified as 49 U.S.C.A. § 10541(a)(2) (1979), which provides expressly that water carriers engaged in interstate commerce may remain under the jurisdiction of the ICC under that Part even if they pass "outside the United States." 323 U.S. at 621–22, 65 S.Ct. 471. The Court, however, finally rests its holding in favor of ICC jurisdiction on statutory provisions found in both Parts I and III of the Act. *See id.* Furthermore, the ICC's interstate rail-water through route jurisdiction which the Court sustained in the case of railroads under Part I and for water carriers under Part III is also provided expressly in Part I under § 1(1), recodified as 49 U.S.C.A. § 10501(a) (1979). In light of the Court's emphasis on the considerations of international comity underlying the Act's limitation provisions and the Court's explicit objection to the proposed literal construction of that phrase in § 1(1), *see* 323 U.S. at 622 n. 12, 65 S.Ct. 471, and also in order (as we believe the Court intended) to avoid the anomalous result of a statutory conferral of jurisdiction over identical forms of commerce subject to technical limitation in Part I of the Act but not in Part III, we construe the Court's broad statement that "*nothing* in the [IC] Act" bars ICC jurisdiction over interstate water-rail transportation which passes through foreign waters, 323 U.S. at 632, 65 S.Ct. 471 (emphasis added), as pertaining to the interstate limitation clause provisions of both Parts I and III of the Act.

56. As between the two subsections concerning interstate and domestic offshore trade at issue here, *see* 49 U.S.C.A. § 10501(a)(2)(A) & (C) (1979), we face no question of possible error in recodification similar to that discussed earlier, *see* pp. —— —— of 195 U.S.App.D.C., pp. 387–389 of 602 F.2d & notes 39–45 *supra*, for the language of neither subsection in the original statutory formulation immediately precedes the ambiguously-placed limitation clause. *See* 49 U.S.C. § 1(1) (1976).

57. It should not be surprising that the draftsmen of the limitation provision in 1920 gave little consideration to the international status of the "high seas" and the technical limitation under both domestic and international law that this international status places on the bounds of the "States of the United States and the District of Columbia." The draftsmen, however, may well have been concerned about the possibility that a federal agency newly empowered to regulate trade might over-extend its jurisdictional power to trade originating from or traveling to the United States and *passing through or into a foreign country.*

for the purposes of trade between ports of Puerto Rico and inland points of the United States, the limitation clause does not bar ICC jurisdiction over carriers that pass outside the technical geographic bounds of the United States merely by crossing the high seas without entering a foreign country.[58] Thus we are led to the inescapable conclusion, despite apparent geographic limitations, that the IC Act confers on the ICC plenary jurisdiction to require the filing of, and to regulate substantively the tariffs of both the land and sea segments of joint through rail-water routes for the carriage of goods between ports of Puerto Rico and inland points of the United States.

### C. Statutory Authority Claimed for Jurisdiction of the FMC.

Since it seems clear to us that the language of the IC Act confers on the ICC plenary jurisdiction over both the land and sea portions of the present joint through trade, our statutory enquiry could come to an end. For the Intercoastal Shipping Act,[59] on which the FMC relies as the source of its authority to regulate the marine portion of this trade, must be read together with the Shipping Act, 1916, as amended,[60] which explicitly provides that both Acts "shall not be construed to affect the power or jurisdiction of the . . . [ICC], nor to confer upon the . . . [FMC] concurrent power or jurisdiction over any matter within the power or jurisdiction of . . . [the ICC]."[61]

Thus the enquiry of this case has properly been posed as, first, whether the IC Act confers jurisdiction on the ICC over the marine (as well as the land) segment of joint through trade between Puerto Rico and inland points of the United States; and, second, only upon the condition that such jurisdiction over the marine segment is not conferred on the ICC, whether the Intercoastal Shipping Act confers such jurisdiction on the FMC.[62] The potential for such a problem of concurrent power is raised by our finding (discussed earlier) that the IC Act confers jurisdiction on the ICC over both the land and sea segments of the present trade. The Shipping Act's concurrent power clause would thus be triggered if the Intercoastal Shipping Act confers any overlapping authority on the FMC. Since the FMC and intervenor Sea-Land have argued forcefully that only the Intercoastal Shipping Act speaks to the issue of agency authority over the marine leg of the present joint through trade, and since we have conceded that the language of the IC Act is not entirely free from ambiguities, we will enquire briefly whether the jurisdictional claim of the FMC based on the Shipping Acts has merit.

■ The Intercoastal Shipping Act, as amended, applies generally to "every common carrier by water in interstate commerce,"[63] as defined in § 1 of the Shipping Act, 1916. Section 1 of the Shipping Act defines such a carrier as one that is[64]

**58.** We do not, of course, seek to reverse earlier decisions that allow domestic agencies to exercise some degree of control over domestic carriers that do enter a foreign country. *See* cases cited in note 46 *supra* (carriers on through routes into adjacent foreign countries).

**59.** 46 U.S.C. §§ 843–48 (1976).

**60.** 46 U.S.C. §§ 801–42 (1976).

**61.** Shipping Act, 1916, § 33, 46 U.S.C. § 832 (1976). The stated purpose of § 33 was "to obviate a conflict of jurisdiction if in some unforeseen manner any substantive provision of . . . [the chapter of Title 46 empowering the FMC] inadvertently overlaps a corresponding provision of the interstate commerce act." H.R.Rep.No.659, 64th Cong., 1st Sess. 34

(1916); S.Rep.No.689, 64th Cong., 1st Sess. 14 (1916).

**62.** Our construction of § 33 is not disputed by the FMC, which noted in its Report and Order of 15 March 1978, *supra*, that "Shipping Act section 33 . . . precludes the . . . [FMC] from 'concurrently' regulating the same transportation functions as the ICC. In order to construe section 2 of the Intercoastal Shipping Act, it becomes both necessary and proper to construe the . . . [IC] Act as well." *See id., reprinted in* Jt.App. at 99.

**63.** Intercoastal Shipping Act § 5, 46 U.S.C. § 845b (1976).

**64.** 46 U.S.C. § 801 (1976).

engaged in . . . *transportation by water . . . on the high seas* or the Great Lakes on regular routes *from port to port between one State, Territory,* District, *or possession of the United States and any other State, Territory,* District, *or possession of the United States* . . .

Since the Commonwealth of Puerto Rico often has been identified as either a "territory" or "possession" of the United States,[65] the interstate commerce provisions of the Intercoastal Shipping Act are those that must be applied to the question of trade between states of the United States and Puerto Rico.

The authority of the FMC under the Intercoastal Shipping Act to require the filing of tariffs by carriers engaged in interstate land-water through routes, however, is somewhat more circumscribed than the authority of the FMC under that Act to regulate single rate all-water interstate routes. Section 2 of the Intercoastal Shipping Act requires every common carrier by water in interstate commerce to file with the FMC tariffs: [66]

> showing all the rates, fares, and charges for or in connection with transportation between intercoastal points on its own route; *and, if a through route has been established*, all the rates, fares, and charges for or in connection with transportation *between intercoastal points on its own route and points on the route of any other carrier by water.*

This FMC filing requirement for carriers in interstate commerce contrasts sharply with the statutory requirement pertaining to filing of through route tariffs by carriers engaged in foreign commerce. Section 18(b)(1) of the Shipping Act, 1916, provides that every common carrier by water engaged in foreign commerce shall file with the FMC tariffs: [67]

> showing all the rates and charges of such carrier . . . for transportation to and from United States ports and foreign

ports *between all points on its own route and on any through route which has been established.* . . .

Thus the two Shipping Acts provide that each carrier engaged in interstate commerce shall file with the FMC all tariffs pertaining to transportation between intercoastal points on that water carrier's route and the route of any other carrier *"by water,"* but the Acts establish no such "by water" qualification in the parallel foreign commerce provision. Instead, "any through route" that is established in foreign commerce—including, we must presume, a route that extends in part across land of the United States—may be subject to the extent of its water segment (since the Shipping Act pertains only to water carriers) to the jurisdiction of the FMC.

■  With regard to interstate commerce, therefore, § 2 of the Intercoastal Shipping Act: 1) explicitly anticipates FMC regulation only of water carriers; and 2) in the only language that pertains to through routes, appears to restrict FMC through route jurisdiction in interstate commerce (in contrast with FMC jurisdiction in foreign commerce set forth in the Shipping Act) to those through routes that extend *in their entirety* from the coastal points on one water carrier's route to the coastal points on another water carrier's route, *i. e.,* that extend no further than from port to port.

By this construction, § 2 of the Intercoastal Shipping Act provides that all-water through routes established in interstate commerce may be subject as a single unit to regulation by the FMC, and each water carrier associated with such a through route may be obliged by the FMC to submit all "rates, fares, and charges" sought for such transport. But the FMC would have no jurisdiction over the marine segment of an interstate through route—or over the divisions of rates to be charged for carriage of goods on a segment of an interstate

---

**65.** *See* note 26 *supra.*

**66.** 46 U.S.C. § 844 (1976) (emphasis added).

**67.** 46 U.S.C. § 817(b)(1) (1976) (emphasis added).

through route—where that route, as in the present case, begins or ends at an inland point.

We believe that this construction of § 2 is preferable not only for reasons of logic, but principally because it provides for consistency between the jurisdictional provisions of the FMC and ICC. Draftsmen of the interstate maritime shipping provision in 1933 could not have been unaware of the need to concern themselves only with through routes involving transshipment of goods between or among water carriers, for the issue of intermodal (*e.g.,* rail-water) through routes in interstate commerce was already addressed explicitly in § 1(1) of the IC Act. To provide like authority to the FMC would have raised serious problems of

concurrent power, which the Shipping Act specifically sought to avoid.[68]

A contrary construction of § 2 of the Intercoastal Shipping Act, however, is not totally unreasonable: that the maritime interstate commerce through route provision defines only which *segments* of through routes but not the *kinds* of through routes over which the FMC may exercise regulatory authority.[69] This construction rests on the fact that the opening phrase of the interstate through route provision—"and, if a through route has been established"— does not itself specifically identify to which *kinds* of through routes (*e.g.,* rail-water routes as opposed to all-water routes) the remainder of the sentence applies. Thus it could be argued that the FMC is entitled to

---

**68.** *See* p. —— of 195 U.S.App.D.C., p. 393 of 602 F.2d & note 61 *supra.*

**69.** We note, however, that this construction has not been specifically urged upon this court by the FMC. Instead, the FMC asserts that the agency's claim to jurisdiction in this case is not based on the through route provision of § 2, but rather on some other provision of that section. *See* Brief for Respondent FMC at 20–21. Nevertheless, the FMC fails to cite any other statutory language to sustain its claimed authority. The agency instead rests its jurisdictional argument on the contention that the *petitioner* failed to articulate with sufficient clarity, in proceedings below, the statutory grounds for its *opposition* to FMC jurisdiction, *see id.* at 23–26. We believe that the primary responsibility for demonstrating a statutory basis for agency jurisdiction lies with the agency itself, rather than with parties subject to agency regulation. The FMC thus cannot rely upon its cavalier assertion that certain unspecified authority granted to it in § 2 of the Intercoastal Shipping Act is "broad enough" to sustain its exercise of jurisdiction, *see id.* at 31, without specifying exactly what language of § 2 grants such authority.

Though the FMC brief is not clear on the point, the FMC may be premising its claim to jurisdiction on the first clause of § 2 rather than on the second. This clause provides that every common carrier subject to § 2 shall file with the FMC tariffs showing all the "rates, fares, and charges for or in connection with transportation between intercoastal points on its own route . . . ." 46 U.S.C. § 844 (1976). The FMC thus suggests that a "separate statement" of divisions of a joint through rate may constitute, from the *agency's* point of view, a carrier's "rates, fares, and charges," *see* Brief for FMC at 22, and thus fall subject to the

jurisdiction of the FMC. We noted in *Commonwealth of Pennsylvania v. ICC, supra,* that undue concern should not be placed on "labels" given to portions of a joint through route, *see id.,* 182 U.S.App.D.C. at 294, 561 F.2d at 292. But the FMC carries the point much too far. A joint through rate for many purposes—and certainly for nearly all practical purposes from the point of view of shippers—is considered to be a single rate. The divisions of a joint through rate often are not freely disclosed, *see id.,* 182 U.S.App.D.C. at 284, 561 F.2d at 282, and certainly each division cannot be described as a separate "rate" merely for the expedient purpose of conforming that division . to the language of an agency's jurisdictional statute. We also note that the second clause of the FMC's jurisdictional statute provides expressly for jurisdiction over joint through rates and is thus far more specific to the present controversy than the first, which pertains generally only to "rates, fares and charges." *See* 46 U.S.C. § 844 (1976). Thus the FMC must rest its jurisdictional claim on the second clause of § 2, and we confine our textual discussion to the meaning of that clause. *See, e.g., FTC v. Manager, Retail Credit Co., Miami Branch Office,* 515 F.2d 988, 993–94 n. 10 (1975), *quoting D. Ginsberg & Sons v. Popkin,* 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704 (1932) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling.") *See generally National Ass'n of Regulatory Utility Commissioners v. FCC,* 174 U.S.App.D.C. 374, 391, 533 F.2d 601, 618 (1976) (agency has no "license to construe statutory language in any manner whatever, to conjure up powers . . . nor to ignore explicit statutory limitations on Commission authority.").

regulate the water segment of an interstate commerce through route that does *not* begin and end at a coastal point but that, instead, as in the present case, either begins or ends on land.

Support for the above construction, however, must rest heavily on certain dictum in this court's recent decision in *Commonwealth of Pennsylvania v. ICC*.[70] In *Commonwealth of Pennsylvania* we held that the ICC was entitled to require carriers to file tariffs established by carriers for the transport of goods on the marine segment of joint through routes between the United States and foreign countries. We also sanctioned FMC, rather than ICC, substantive jurisdiction over the marine segment of such joint through international trade.

█ Application of our holding in *Commonwealth of Pennsylvania* to the present case, however, is misplaced, because the types of commerce involved in the two cases are totally different. In *Commonwealth of Pennsylvania* no issue was raised (as in the present case) of FMC jurisdiction over the water segment of joint through rates established in "interstate" commerce,[71] and, as

noted above, there is a crucial difference between provisions in the Shipping and Intercoastal Shipping Acts pertaining to the jurisdiction of the FMC over the filing of tariffs for through routes established in foreign as opposed to interstate commerce. Under § 18 of the Shipping Act, 1916,[72] there is no question but that the FMC has authority to require the filing of tariffs for the carriage of goods on the marine segment of joint through routes in foreign commerce. In interstate commerce, however, § 2 of the Intercoastal Shipping Act [73] borrows language from the Shipping Act [74] that most logically must be construed as limiting the routes over which the FMC may exercise any extent of regulatory control to those routes that both begin and end *on water.* Thus our support in *Commonwealth of Pennsylvania* for FMC jurisdiction over the water segment of joint through international trade gains crucial strength from, and must be clearly distinguished from the present case on the basis of, the sharply contrasting statutory provisions that establish the authority of the FMC over through routes in the two types of commerce.[75]

---

**70.** 182 U.S.App.D.C. 280, 561 F.2d 278, 291–92 (1977), *cert. denied*, 434 U.S. 1011, 98 S.Ct. 723, 54 L.Ed.2d 754 (1978).

**71.** We use the term "interstate" commerce here in the sense employed in the Shipping and Intercoastal Shipping Acts, and as defined at 46 U.S.C. § 801 (1976). Since trade in the present case does not in actuality move between "states," however, but between a state and a United States "possession," the term "domestic offshore trade" would be more accurate. The IC Act, however, has chosen perhaps the wisest path by using no such descriptive terms at all. *See* 49 U.S.C. § 1(1) (1976), recodified at 49 U.S.C.A. § 10501 (1979).

**72.** 46 U.S.C. § 817(b)(1) (1976).

**73.** 46 U.S.C. § 844 (1976).

**74.** *See* 46 U.S.C. § 817(a) (1976).

**75.** Furthermore, it may be that the "concurrent power" provision of § 33 of the Shipping Act, 46 U.S.C. § 832 (1976), which bars authority to the FMC where such authority is granted elsewhere to the ICC, *see* p. ⸺ of 195 U.S. App.D.C., p. 393 of 602 F.2d & note 61 *supra,* as a practical matter could not have served to bar the exercise of concurrent

power by the FMC and ICC in the area of foreign commerce at issue in *Commonwealth of Pennsylvania, supra,* as it does in the area of interstate and domestic commerce. For § 33 of the Shipping Act must be read together with § 19(2) of the Merchant Marine Act, 1920, 46 U.S.C. § 876(2) (1976), which provides that "[n]o rule or regulation shall be established by any . . . agency of the Government which affects shipping *in the foreign trade* . . . until such rule or regulation has been submitted to the . . . [FMC] for its approval . . . ." (emphasis added). As the petitioner points out, *see* Brief of Petitioner TMT at 19, until the ICC finally decided voluntarily to limit its exercise of jurisdiction over the joint rates in foreign commerce involved in *Commonwealth of Pennsylvania, supra,* 182 U.S.App. D.C. at 286–87, 561 F.2d at 284–85, the FMC had declared the pertinent ICC tariff-filing rules invalid pursuant to § 19(2). *See* 40 Fed.Reg. 43720 (23 Sept. 1975). Though we need not rule here on the merits of the FMC's contention concerning § 19(2), we note that the FMC possesses no such veto power with respect to ICC rules affecting only interstate (or domestic offshore) trade, or any similar power that might prevent the bar to concurrent power in § 33 from assuming full effect in the present case.

We do not believe that this difference between the language of the two sections of the shipping laws was merely accidental. Instead, we believe that these laws were drafted with the specific purpose of avoiding a conflict between the ICC and the predecessor agencies of the FMC over interstate (including domestic offshore) intermodal rates by withholding such jurisdiction from the shipping agencies.[76]

Different policy considerations also are present in foreign commerce, for which we have found that Congress intended a bifurcated system of regulatory jurisdiction over rail-water joint through routes.[77] Thus we agree with the argument of the petitioner that we do not have here, as in *Commonwealth of Pennsylvania*, "two regulatory systems . . . applicable" to the same rates.[78] We also have no problem of overlapping or concurrent jurisdiction, since the applicable language of the Shipping Acts confers no jurisdiction on the FMC that is also conferred elsewhere on the ICC.

### D. The FMC's "Section 21" Claim.

The FMC has ordered petitioner to file its joint rail-water rates and divisions not only under § 2 of the Intercoastal Shipping Act,

but also pursuant to § 21 of the Shipping Act, 1916. Section 21 in very general language authorizes the FMC to "require any common carrier by water . . . to file with . . . [the FMC] any . . . rate, or charge . . . appertaining to the business of such carrier . . . subject to . . . [the Shipping and Intercoastal Shipping Acts]."[79]

Since the commencement of these proceedings, the FMC has supported this statutory filing claim with arguments that have been little more than perfunctory, and that have sought (we believe without success) to establish a rationale for the § 21 claim that is distinguishable from the rationale pertaining to the FMC's principal claim under the Intercoastal Shipping Act. In its initial Order, the FMC noted merely that information on TMT's joint rates and divisions was sought under § 21, as well as under § 2 of the Intercoastal Shipping Act, because such information was "necessary to enable the . . . [FMC] to make initial determinations concerning the reasonableness of TMT's [single rate] all water service from . . . [a mainland port] to Puerto Rico."[80] In its Report and Order here under review, the FMC noted that the infor-

**76.** *See generally* Hearings on § 4491 before the House Committee on Merchant Marine, Radio and Fisheries, 72d Cong., 2d Sess. 402 (1933); Hearings on H.R. 8532 before the House Committee on Merchant Marine and Fisheries, 74th Cong., 2d Sess. 247–48 (1938). At the time the maritime statutes were passed, the ICC already had exercised a degree of jurisdictional authority over joint rail-water transportation in the domestic offshore trade, including, specifically, trade to and from Puerto Rico. *See Conference Ruling 201*, 45 ICC, app. p. 56 (1909) (ICC recognition of the "validity of joint through rates from or to points in the United States to or from a port or ports in Puerto Rico when properly concurred in by the water carriers"). In the absence of any evidence to the contrary, we must assume that Congress deliberately worded the shipping laws in order to leave with the ICC exclusive jurisdiction over such joint rail-water rates in domestic offshore trade, though not in foreign trade.

**77.** For reasons of international comity, regulation of carriers involved in foreign commerce has often been less stringent than that of carriers in domestic commerce; for carriers in foreign commerce, by definition, either cross or

touch upon the shores of foreign countries, where an extension of jurisdiction by the country of the carrier may be problematic. *See, e. g., United States v. Pennsylvania Ry. Co., supra*, 323 U.S. at 621–22, 65 S.Ct. 471. Certainly, also, because of complexities presented by the possibly overlapping regulatory schemes of a multitude of countries, there is need for maximal consistency in whatever regulation there may . be of carriers involved in foreign commerce. Such concern with the need for consistency in international trade regulation is reflected in § 19(2) of the Merchant Marine Act of 1920, 46 U.S.C. § 876(2) (1976), which gives the FMC power, subject to presidential review, to veto any regulations issued by other agencies "which affec[t] shipping in the foreign trade." *See* note 75 *supra*.

**78.** *See* Brief of Petitioner TMT at 14, *quoting Commonwealth of Pennsylvania v. ICC, supra*, 182 U.S.App.D.C. at 294, 561 F.2d at 292.

**79.** 46 U.S.C. § 820 (1976).

**80.** *See* FMC Order to Show Cause of 18 November 1977, *supra, reprinted in* Jt.App. at 4–5.

**398**

mation sought under § 21 was required in order to "help" the FMC make the same determination identified in its first Order, and the FMC suggested for the first time that the § 21 claim pertained only to TMT's divisions of the joint through rates rather than the entire joint through rates, for which filing was sought only under the Intercoastal Shipping Act.[81]  Subsequently the FMC has argued that TMT's through route divisions would be "both material and relevant in analyzing local rates and practices associated therewith"[82]—an argument developed in less cursory fashion only in briefs presented before this court.[83]

In reviewing the FMC's § 21 claim, we note preliminarily that the present proceedings do not concern the reasonableness of petitioner's single rate all-water tariffs for trade between ports of the mainland and Puerto Rico.  As recently as 31 March 1978 informal agreement concerning the reasonableness of those rates was apparently reached, and no present genuine controversy concerning these rates has been brought to our attention.[84]  We do not argue here that the FMC's § 21 powers can be exercised only in order to procure information immediately and exclusively relevant to a live tariff controversy or investigation.[85]

But in the context of the FMC's principal attempt in these proceedings to exercise substantive jurisdiction over petitioner's tariffs, the off-hand manner in which the FMC's § 21 claim has been coupled with the principal, substantive jurisdictional claim makes it clear that the FMC seeks via § 21 to "bootstrap" its way to tariff information which it feared it would not be entitled to gain under the Intercoastal Shipping Act.

This court previously has not hesitated to bar a § 21 information claim by the FMC, or by its predecessor agency, where the agency has failed adequately to state the reason and purpose for the information sought and thus establish a basis to determine the relevance of the information to agency action and the reasonableness of the agency request.[86]  By these standards, the agency's various statements of need for disclosure of TMT's through route divisions under § 21, to the extent that such statements concern some purported examination by the FMC of TMT's *all-water* tariffs rather than TMT's *through route* tariffs (over which we have held the FMC has no jurisdiction), are clearly deficient.  The FMC's casual, albeit repeated assertions of a "need to know," with little more, can not suffice.

81. See FMC Report and Order of 15 March 1978, *supra, reprinted in* Jt.App. at 91–92.

82. *See* FMC Docket No. 77–75, Motion for Stay Denied, filed 14 April 1978, *reprinted in* Jt.App. at 126.

83. *See* Brief for Respondent FMC at 66–70.

84. *See* FMC Docket No. 77–27 (reasonableness of TMT's all-water rates between Jacksonville and Puerto Rico); Brief of Petitioner TMT at 30 (noting apparent settlement of all-water rate controversy).  The FMC also notes that an FMC administrative law judge recently has found TMT's local rates to be "reasonable" and lawful.  *See* Brief for Respondent FMC at 69 n. 70.

85. *See Far East Conference v. Federal Maritime Commission*, 119 U.S.App.D.C. 110, 114, 337 F.2d 146, 150 (1964), *cert. denied*, 379 U.S. 991, 85 S.Ct. 704, 13 L.Ed.2d 611 (1965) (§ 21 orders available "to aid investigation without . . . a charge of violation of the [Shipping] Act, or belief even that such a violation is probable.").

86. *See, e.g., Hellenic Lines Ltd. v. Federal Maritime Board*, 111 U.S.App.D.C. 151, 153, 295 F.2d 138, 140 (1961) (vacating a § 21 order because of merely perfunctory statement of purpose and consequent lack of standard to determine relevancy to agency action); *Montship Lines, Ltd. v. Federal Maritime Board*, 111 U.S.App.D.C. 160, 168, 295 F.2d 147, 155 (1961) (§ 21 order "fatally defective" because of absence of statement of purpose and consequent inability of court to determine order's "reasonableness").  *Cf. Isbrandtsen-Moller Co. v. United States*, 300 U.S. 139, 144–45, 57 S.Ct. 407, 410, 81 L.Ed. 562 (1937) (upholding § 21 order where order's purpose was clearly stated and information sought was required to "enable . . . [the agency] to perform its functions . . ."); *Far East Conference v. Federal Maritime Commission, supra*, 119 U.S.App.D.C. at 114–15, 337 F.2d at 150–51 (upholding § 21 order to aid ongoing Commission trade study where purposes were clearly set forth and "reasonableness of rates" was clearly at issue).

■ This obligation to explain the reasons for which the FMC seeks filings under § 21 is no empty ritual or formalism, but instead is a vital necessity, *inter alia*, to allow a reviewing court to assure that the agency has "given reasoned consideration to all the material facts and issues"[87] and "pertinent factors"[88] at stake in the agency's order. Many such issues are present here, and in large part these are the identical issues that led the petitioner to protest so vigorously the FMC's order to file its through route tariffs and divisions under the Intercoastal Shipping Act.[89] To allow the agency, in what is little more than a sideshow to the present proceedings, to extract the very information through the back door that it is barred from gaining through the front, would violate fundamental fairness as well as the purpose and intent of § 21. Thus we must remand to the agency for further consideration that portion of the agency's Order that rests on authority claimed under § 21 of the Shipping Act, 1916.

## III. POLICY CONSIDERATIONS

Returning to the central issue of substantive jurisdiction, certain policy considerations support our holding in favor of the ICC. As conceded by the FMC in its Order under review, situations have long existed in which water carriers simultaneously have transported cargo at rates subject to ICC jurisdiction and cargo subject to FMC jurisdiction, without causing "undue difficulties to date."[90] A notable example is the carriage of goods by water between the mainland and the states of Alaska and Hawaii, for which Congress has explicitly provided for jurisdiction in the ICC over both the onshore and ocean segments of joint through motor-ocean and domestic water-ocean trade.[91] Goods transported by single rates from port to port along these routes remain subject to the jurisdiction of the FMC.[92] We do not foresee that any greater difficulties will be encountered by affected parties as a result of the analogous practice here.

To the contrary, greater efficiencies may result in the operations of the carriers, shippers, ports, and also the regulatory agencies if only a single agency regulates the transport of cargo on the full extent of the offered service in the domestic offshore trades. Though intervenor Sea-Land objects that the result we reach here will serve to "dichotomize" regulatory jurisdiction to and from Puerto Rico,[93] certainly from the point of view of shippers of goods on through routes the result will be just the opposite.[94] Nor will the "freedom of the

---

**87.** *Greater Boston Television Corp. v. Federal Communications Comm'n*, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), *reh. denied* (1971), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971), *reh. denied*, 404 U.S. 877, 92 S.Ct. 30, 30 L.Ed.2d 125 (1971).

**88.** *Permian Basin Area Rate Cases*, 390 U.S. 747, 792, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), *reh. denied*, 392 U.S. 917, 88 S.Ct. 2050, 20 L.Ed.2d 1379 (1968).

**89.** TMT argues that disclosure of divisions will deter the participation of rail carriers in its through routes, *see* note 8 *supra*, and, in any event, that the divisions of through rates generally are of little relevance to a determination of the reasonableness of single rates. *See* Brief of Petitioner TMT at 29–31. *Cf.* Brief for Intervenor ICC/DOJ at 27 (probative value of rate divisions for purposes of rate comparison is "rather tenuous under most circumstances"). The FMC disputes all of these contentions. *See* Brief for Respondent FMC at 68–69. The record of the case, however, is far too poorly developed on these points to allow us to determine the merits of the competing claims.

**90.** *See* FMC Report and Order of 15 March 1978, *reprinted in* Jt.App. at 110–11.

**91.** *See* IC Act §§ 216(c) & 305(b), 49 U.S.C. §§ 316(c) & 905(b) (1976), recodified as 49 U.S.C.A. § 10703(a)(4)(D)(ii) (1979).

**92.** *See* Intercoastal Shipping Act § 2, 46 U.S.C. § 844 (1976).

**93.** *See* Brief for Sea-Land at 19–20.

**94.** *See* Brief of Petitioner TMT at 26 (dual regulation of through routes in domestic offshore commerce to lead to "greater complications, frustrations, . . . duplicative data furnishing, and . . . less effective rate regulation . . . [because] a shipper believing a rate to be too high must present his case to two agencies rather than one."). Even a chairman of the FMC before a congressional committee in

seas," so ardently defended by the FMC, hereby be placed in jeopardy.[95]

Furthermore, no demonstration whatsoever has been made that the ICC is not as well qualified as its sister agency, the FMC, to regulate trade that falls within its rightful jurisdiction, or that the ICC will not faithfully execute its mission to balance and protect those interests affected by its authority.[96] If adverse consequences do result, and if it appears that on balance a bifurcated system of regulatory jurisdiction over these joint through routes is to be preferred, Congress can make the necessary statutory changes by the addition or deletion of a few words.[97]

## CONCLUSION

As we noted in a recent case even more complex than this one, "the present case turns on the question of the meaning and proper construction of a very few words." [98] Careful reading of the applicable "few words" of the Interstate Commerce, Ship-

ping, and Intercoastal Shipping Acts leads us to conclude that those Acts confer on the ICC plenary and exclusive jurisdiction over both the rail and water segments of joint through trade between inland points of the United States and ports of Puerto Rico. This is a limited holding that reaches no issue resolved in our previous case of *Commonwealth of Pennsylvania v. ICC*, which concerned foreign rather than domestic offshore trade.

Furthermore, we conclude that the FMC has not laid the proper foundation for its order to TMT to file the divisions of its joint through rates under § 21 of the Shipping Act. Thus we remand that portion of the Order and we pass no judgment on its merits at the present time.

For the reasons set forth above the Order of FMC here under review is vacated in part, and remanded in part to the FMC for further consideration in light of this opinion.

1974, with regard to joint through rates, stated that: "I am firmly convinced that single agency regulation of the through intermodal rate is imperative if this Nation is to benefit from technological advancement in transportation . . . . " *Hearings on Intermodal Transportation before the House Committee on Merchant Marine and Fisheries*, 93d Cong., 2d Sess. 15 (1974). *See also id.* at 13.

**95.** The ICC has not asserted that its power under former Part I of the IC Act to prescribe rates for rail-water joint through routes includes the power to require that through rail-water rates be established. *See, e.g., Lucking v. Detroit & Cleveland Navigation Co.*, 265 U.S. 346, 351–52, 44 S.Ct. 504, 68 L.Ed. 1047 (1924); *Joint Rail-Water Rates to Hawaii (Matson Navigation Company)*, 351 ICC 213 (1975); *Jurisdiction Over Water Carriers*, 15 ICC 205, 209, 217–18 (1909). This point is acknowledged also by the FMC, which notes that the ICC may regulate rail and water carriers under Part I of the IC Act "only so long as . . . [the carriers] voluntarily maintain a joint through route, and only as to the particular route which has been established." FMC Report and Order of 15 March 1978, *supra, reprinted in* Jt.App. at 117 n. 49. As such, the fears of the FMC that our present decision could "effectively end . . the freedom of the seas," purportedly preserved for domestic offshore carriers by shipping legislation, is not only grossly exaggerated but groundless. *See id.* at 116–17.

**96.** As we noted earlier, different considerations are present here than in the area of foreign commerce, for which we have previously approved a dual regulatory system. *See Commonwealth of Pennsylvania v. ICC, supra. See also* p. —— of 195 U.S.App.D.C., p. 397 of 602 F.2d & note 77 *supra*; Brief of Petitioner TMT at 26 n. 20 (because of different regulatory standards of FMC and ICC applicable to foreign commerce, exclusive FMC jurisdiction over water carriage on both single and joint through routes more justified in foreign than in domestic offshore commerce).

**97.** As this court stated in *Border Pipe Line Co. v. Federal Power Comm'n*, 84 U.S.App.D.C. 142, 146, 171 F.2d 149, 153 (1948):

. . . If an administrative agency thinks that the real intent and purpose of a statute is broader than or different from its terms, it need only ask Congress for an enlargement or clarification. We are no longer in an age when such inquiry is impractical. The wise and sound course for the courts is to give to the terms of a statute their plain meaning, so long as the resultant effect is sensible and not in conflict with a discernible purpose.

**98.** *Citizens to Save Spencer County v. United States Environmental Protection Agency*, 195 U.S.App.D.C. 30 at 46, 600 F.2d 844 at 860 (1979).